ATTORNEYS FOR APPELLANT
Amy E. Karozos
Ruth Ann Johnson
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE, INDIANA LEGAL
SERVICES, INC.
Annette S. Biesecker
Adam C. Mueller
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Patrick M. Rhodes
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 49S02-1308-JT-558

**FILED**
Mar 13 2014, 2:31 pm

*Kevin S. Smith*
**CLERK**
of the supreme court,
court of appeals and
tax court

IN RE THE INVOLUNTARY TERMINATION OF
THE PARENT-CHILD RELATIONSHIP OF G.P.,
A MINOR CHILD, AND HIS MOTHER, J.A.

J.A.,

                                            *Appellant (Respondent below),*

                          v.

INDIANA DEPARTMENT OF CHILD SERVICES
AND CHILD ADVOCATES, INC.

                                            *Appellees (Petitioners below).*

Appeal from the Marion County Superior Court, No. 49D09-1108-JT-031826
The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1208-JT-643

**March 13, 2014**

**David, Justice.**

We have always said that a parent's due process rights are vital during court proceedings aimed at determining whether the parent's child is a Child in Need of Services. Here, a mother waived her right to counsel at an initial CHINS hearing and her son was found to be a CHINS. At a subsequent CHINS review hearing, the mother requested counsel and the trial court found that she was indigent and entitled to representation—but it failed to actually follow through and appoint an attorney to her case.

After additional CHINS hearings at which the mother remained unrepresented, the Department of Child Services filed an action to involuntarily terminate the mother's parental rights with respect to her son. At the mother's request, the trial court appointed counsel to represent her during the TPR process. But even with representation at this stage, her parental rights were terminated and her son has since been adopted by his paternal grandparents. We now assess the impact of the failure to appoint counsel for the mother during the CHINS process.

### Facts and Procedural History

J.A. was G.P.'s mother.[1] G.P. was born on June 5, 2009, and on October 5, 2010, DCS filed a petition alleging that G.P. was a CHINS because his mother had a history of drug abuse that hindered her ability to care for G.P. At an initial hearing before the CHINS court on

---

[1] G.P.'s father was incarcerated for nearly all of the time relevant to this case, but he was represented—separately from J.A.—by counsel at all the relevant proceedings and consented to G.P.'s eventual adoption. And though he was a party to the proceedings at the CHINS and trial level, he is not a party to this appeal and the facts as provided relate only to J.A.

October 13, 2010, J.A. waived her right to counsel. J.A. admitted the allegations presented in the CHINS petition and G.P. was placed with his paternal grandparents with J.A.'s consent. As part of its dispositional decree, the CHINS court ordered J.A. to comply with a number of requirements and services aimed at reunifying her with G.P.

At a subsequent review hearing in February 2011, J.A. requested appointed counsel. The CHINS court conducted an indigency examination and found she was entitled to counsel. But for reasons unknown, the court did not then actually appoint counsel for J.A; it continued with the hearing instead. And during the hearing, DCS reported several violations of J.A.'s obligations under the dispositional decree. The court ordered G.P. to remain with his grandparents, but still viewed reunification with J.A. as the plan for permanency.

In May 2011, J.A. appeared at another review hearing, still without counsel. This time the CHINS court did not even ask if she wanted counsel before proceeding.[2] In this hearing, DCS again alleged that J.A. had violated her obligations under the dispositional decree. It requested that a permanency hearing be set. J.A. effectively admitted to DCS's allegations, but said that she was turning herself around and wanted to re-engage with her required services in order to get custody of G.P. The CHINS court set the matter for an August 16, 2011, permanency hearing.

J.A. failed to appear for the August 16 hearing, and the court apparently still believed she "was representing herself in this matter." (Supp. App. at 32.) The hearing proceeded, and DCS

---

[2] Initially J.A. was not even present, having apparently had a transportation issue. After noting she did not have an attorney representing her, the CHINS court delayed the hearing until J.A. arrived. But it never inquired as to whether she wanted representation, whether counsel had been appointed, or whether she wanted to proceed pro se.

3

stated that it had not had contact with J.A. since the May review hearing and that she had not actually re-engaged with services. G.P.'s guardian ad litem added that G.P. was doing very well with his paternal grandparents, and—with DCS's agreement—therefore sought to change the permanency plan from reunification with J.A. to adoption by the grandparents. The CHINS court agreed that it would be in G.P.'s best interest to change the plan to adoption.

On August 18, 2011, DCS filed a petition to terminate the parent-child relationship between J.A. and G.P. The trial court set the matter for an initial hearing on September 11, 2011. J.A. did not appear for that hearing, nor did counsel appear for her, and the court continued it to September 30, 2011. Neither J.A. nor counsel on her behalf appeared for this second hearing, either, so the trial court continued it again. DCS also requested a default hearing. On December 6, 2011, the trial court tried to hold its previously continued hearing, but J.A. again did not appear in person or by counsel. The trial court then set J.A.'s case for a default hearing on January 12, 2012. DCS requested this hearing be continued, and the court set it for February 16, 2012.

On January 29, 2012, J.A. filed a letter with the court requesting to have counsel appointed in her case. The court then appointed a public defender to represent J.A. and changed the February default hearing to a pre-trial hearing. J.A. did not appear at the pre-trial hearing, but her lawyer did. The matter was set for trial to begin on April 9, 2012.

J.A. filed a motion to dismiss, arguing that she had been deprived of due process in that she requested counsel in February 2011, but counsel had not been appointed until nearly a year later—and only after J.A. requested it again. She argued that had counsel been appointed, she would have had representation at the hearings she missed, and such counsel would have been able to inform the court of the reasons for her absence—and that those reasons related to her efforts to re-engage in services, maintain her sobriety, and have a healthy and drug-free pregnancy with a second child. But because her interests were unrepresented at the review

4

hearings and permanency hearings, J.A. said, the CHINS court never heard those facts. The trial court denied her motion.

A three-day trial was held, on days in April and June 2012.[3] On July 10, the trial court issued its order terminating the parent-child relationship between G.P. and J.A. A month later, G.P. was adopted by his grandparents.[4] J.A. appealed, arguing that the evidence was insufficient to justify the termination of her parental rights and that she was denied due process by not receiving appointed counsel after she had been found to qualify.

The Court of Appeals affirmed. In re G.P., J.A. v. Ind. Dep't of Child Servs., 985 N.E.2d 786 (Ind. Ct. App. 2013), reh'g denied. Though it was "disappointed" that the CHINS court failed to appoint counsel for J.A. even though she qualified, it nevertheless found the error to be harmless. Id. at 791. It also concluded that the evidence presented at the eventual TPR proceeding was sufficient to sustain the trial court's determination that termination of J.A.'s parental rights was in the best interests of G.P. Id. at 792. We granted transfer, thereby vacating the Court of Appeals opinion. In re G.P., J.A. v. Ind. Dep't of Child Servs., 993 N.E.2d 182 (Ind. 2013) (table); Ind. Appellate Rule 58(A). Because we find it dispositive, we address only J.A.'s due process claim and its impact on the subsequent proceedings.

---

[3] The trial was split so that J.A.'s newly appointed counsel could conduct additional discovery.

[4] Just days before oral argument in this matter, DCS informed this Court of G.P.'s adoption pursuant to our direction in In re Adoption of C.B.M. & C.R.M., C.A.B. v. J.D.M. & K.L.M., 992 N.E.2d 687, 693 (Ind. 2013).

## I.  J.A.'s Due Process Claim

J.A. argues that the CHINS court, by telling her it would appoint a lawyer to represent her but failing to do so, denied her constitutional right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution.  See U.S. CONST., amend. XIV, § 1. We agree.

### A.  *J.A. Had a Right to Counsel.*

Indiana Code section 31-32-4-3 provides that "[t]he court *may* appoint counsel to represent any parent in any other proceeding."  Ind. Code § 31-32-4-3(b) (2008) (emphasis added).  And Indiana Code section 31-32-4-1 likewise includes, among its list of persons entitled to counsel, "[a]ny other person designated by law."  Ind. Code § 31-32-4-1(3) (2008).  DCS argues that these two statutes, when read together, mean that appointment of counsel in a CHINS proceeding is a matter of trial court discretion and not a statutory right.

This position is consistent with past appellate decisions in this state.  See In re M.M., M.M. v. Elkhart Office of Family & Children, 733 N.E.2d 6, 10–11 (Ind. Ct. App. 2000) (finding presumption against court-appointed counsel in CHINS proceedings, and statutory scheme made appointment subject to abuse of discretion review); In re E.P., J.P. v. Marion Cnty. Office of Family & Children, 653 N.E.2d 1026, 1031–32 (Ind. Ct. App. 1995) (presumption against appointment of counsel in civil proceedings where individual's personal liberty not at stake, and appointed counsel not compelled in CHINS proceeding under Mathews [Mathews v. Eldridge, 424 U.S. 319 (1976)] balancing test).  But as the Court of Appeals and J.A. point out, there is a third statute that is relevant here—one that DCS inexplicably fails to address in its brief and that the Court of Appeals was unsure on how (or if) to apply.  See In re G.P., 985 N.E.2d at 789.

Indiana Code section 31-34-4-6 enumerates a number of legal rights afforded to the parent of a child alleged to be abused or neglected when that child is subject to detention by DCS or DCS has filed a CHINS petition, and requires DCS to inform the parent, in writing, of those rights. Ind. Code § 31-34-4-6 (2008). One such right given to the parent is "[t]he right to . . . be represented by an attorney . . . at each court proceeding on a petition alleging that the child is a child in need of services." Ind. Code § 31-34-4-6(a)(2)(A). And importantly, "[t]he parent . . . *has the right to be represented by a court appointed attorney* under clause (A) upon the request of the parent . . . if the court finds that the parent . . . does not have sufficient financial means for obtaining representation as described in IC 34-10-1." Ind. Code § 31-34-4-6(a)(2) (emphasis added).

The Court of Appeals asked for clarification on how this provision operates.

> We note that the case law does not clearly define how sections 31-32-4-3 and 31-34-4-6 are to be read in conjunction with each other. Is it mandatory to appoint counsel for indigent parents when requested, but *only* for indigent parents, and *only* when requested? Is that right waivable, if, after the request, there is no appointment but, as here, the parent does not raise the lack of appointment with the court? Is it fundamental error if the court denies or overlooks the appointment for an indigent parent who has requested counsel? Based on our reading of the current case law, the lack of appointment will be reviewed for an abuse of discretion, but this is an area that would benefit from clarification by the legislature or our supreme court.

In re G.P., 985 N.E.2d at 789 n.2. Owing to its uncertainty, the Court of Appeals therefore relied upon In re M.M. and In re E.P. and, by assessing the Mathews factors, found no abuse of discretion in the trial court's failure to actually appoint counsel for J.A. Id. at 789–91.

We think the answer is fairly straightforward. To begin with, to the extent any case law holds that a trial court has discretion to appoint counsel for an indigent parent in a CHINS

7

proceeding, those cases are not correct on that point.[5] Section 31-34-4-6 is an explicit provision of just such a statutory right, though subject to its own internal qualifications, and is consistent with the operation of the rest of the statutory scheme. And it exists independently of—though informed and influenced heavily by—any constitutionally compelled right to counsel pursuant to the Due Process Clause of the Fourteenth Amendment. Cf. Holmes v. Jones, 719 N.E.2d 843, 846 (Ind. Ct. App. 1999) ("the pauper counsel statute creates an independent right to counsel for indigent litigants")[6]; see also Lassiter v. Dep't of Social Servs. of Durham Cnty., N.C., 452 U.S. 18, 33 (1981) ("In its Fourteenth Amendment, our Constitution imposes on the States the standards necessary to ensure that judicial proceedings are fundamentally fair. A wise public policy, however, may require that higher standards be adopted than those minimally tolerable under the Constitution."). "Informed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but also in dependency and neglect proceedings as well." Id. at 33–34.

Reading the juvenile statutes collectively, Section 31-32-4-1 provides that parents in TPR proceedings are entitled to be represented by counsel, along with "[a]ny other person designated by law." And one such person "designated by law"—designated by Section 31-34-4-6 specifically—is the indigent parent who requests a court-appointed attorney in a CHINS

---

[5] See, e.g., In re L.B. & L.C., L.B. v. Marion Cnty. Dep't of Child Servs., 889 N.E.2d 326, 335 (Ind. Ct. App. 2008) (pointing to Section 31-32-4-3 as support for idea that appointment of counsel in CHINS proceeding is left to discretion of trial court); In re M.M., 733 N.E.2d at 11.

[6] Holmes was interpreting an earlier version of Indiana's pauper counsel statute, governing the appointment of counsel for indigent litigants in civil cases. Holmes, 719 N.E.2d at 845–46. That statute, then Indiana Code § 34-1-1-3, provided that a court "shall assign" an indigent litigant an attorney upon application by the litigant. Id. at 846. Unlike the present CHINS statute, however, the current version of the pauper counsel statute provides that a court "may, under exceptional circumstances," appoint an attorney—and enumerates factors to be considered in assessing the presence of those exceptional circumstances. Ind. Code § 34-10-1-2 (2008).

8

proceeding and is found by the trial court to be indigent. To the extent the trial court "may" appoint counsel to represent a parent in another proceeding, it would be pursuant to Section 31-32-4-3. It does *not* have discretion in a circumstance falling under Section 31-34-4-6.[7]

Section 31-32-4-3 would, however, still give the trial court discretion to appoint counsel, for example, for a parent who perhaps fails to meet the statutory requirements for being indigent but for whom appointed counsel might still be appropriate. Or a trial court could appoint counsel to serve as stand-by counsel for the parent who decides to proceed pro se. These discretionary circumstances might certainly be rarer than the typical parents who either hire their own lawyer or have a public defender appointed, but the statutes appropriately anticipate their occurrences and afford trial courts the flexibility to respond in kind. And appellate review of any denials of these discretionary appointments would still entail the analysis from our prior case law, balancing the Mathews factors against the general presumption against appointed counsel in civil matters. Where those factors overcome the presumption, due process would require appointed counsel, and a trial court would abuse its discretion in deciding otherwise.

### B. J.A. Did Not Permanently Waive Her Right to Counsel for All Subsequent Proceedings or Invite the Due Process Violation.

DCS argues that J.A. should have contested the trial court's failure at the subsequent hearings. "[O]nce [J.A.] realized that counsel was not appointed, she should have protested and brought it to the court's attention. Having failed to do so, she should be deemed to have waived

---

[7] We emphasize that this section does not necessarily compel the trial court to inquire, in each and every case, as to whether the parent wants appointed counsel—the language of the provision provides that the parent must affirmatively request this statutory right. Whether there might be exceptions to this is not a question before the Court today, because here the trial court *did* inquire, and J.A. *did* make an affirmative request.

the argument." (Appellee's Br. at 18.) Alternatively, it claims that J.A. invited the error by failing to "ask for counsel at that [subsequent] hearing or question the court as to the appointment." (Appellee's Br. at 19.) But we do not think either of these claims is appropriate.

It is true that a pro se litigant is held to the same standards as a trained attorney and is afforded no inherent leniency simply by virtue of being self-represented. Gunashekar v. Grose, 915 N.E.2d 953, 955 (Ind. 2009). And J.A. certainly cannot (and does not) claim to have been unaware of this expectation because the trial court clearly explained it to her when she waived her right to counsel at the October 2010 initial hearing. By choosing that route, she was well aware that the standards to which she would be held were those of an attorney, and she knew that there were consequences for failing to meet those standards.

But we have never held that a litigant who elects to waive the right to counsel is permanently bound by that decision—and here J.A. changed her mind as to this course of action at the very next hearing, requested an attorney, and was told by the court that she would have one appointed to represent her. Nor have we ever held that a litigant who has been told that they would receive appointed counsel must continually re-request said counsel at each and every hearing where an attorney is not provided to her. The very fact that this notion might occur to lawyers and judges looking at her case, but not occur to J.A. at her hearings, is at least somewhat indicative of why she needed the lawyer in the first place.

We therefore think it inappropriate to reward J.A.'s change of course by still holding her to the standards of an attorney at subsequent hearings when counsel was never actually appointed. She is not, at that point, a pro se litigant: she is a client standing alone in a courtroom where her parenting skills and her child's care and custody are all being challenged, and everyone else but her either *is* a lawyer or *has* a lawyer. That she then answered the judge's questions is not a waiver or invited error, regardless of whether it would be if J.A. were pro se or

10

had counsel present—here it is what we expect most any ordinary person would do when questioned by a member of the judiciary in a courtroom under such circumstances.

Similarly, nothing in the record indicates J.A. was attempting to game the system or give herself any unfair advantage such that we should attribute her missteps to a waiver of the right to counsel. Cf. Hawkins v. State, 982 N.E.2d 997, 999–1002 (Ind. 2013) ("[W]illful, knowing, and voluntary misconduct aimed at manipulating the court system for one's own benefit will not be looked upon with anything resembling favor. Nevertheless, the record in this case . . . does not support a finding that Hawkins's failure to appear at trial constituted a waiver of his right to counsel."). That J.A. could have done more at this point, or done better, is perhaps true. But that should not be taken to mean she no longer wanted—or deserved—an attorney.

### C. J.A. Was Denied Due Process.

Due process protections bar "state action that deprives a person of life, liberty, or property without a fair proceeding." In re C.G., Z.G. v. Marion Cnty. Dep't of Child Servs., 954 N.E.2d 910, 916 (Ind. 2011) (quoting In re Paternity of M.G.S., 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), trans. denied). It is unequivocal that the termination of a parent-child relationship by the State constitutes the deprivation of "an important interest warranting deference and protection," and therefore "[w]hen the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process." Id. at 916–17.

Likewise, due process protections at all stages of CHINS proceedings are "vital" because "[e]very CHINS proceeding 'has the potential to interfere with the rights of parents in the upbringing of their children.'" In re K.D. & K.S., S.S. v. Ind. Dep't of Child Servs., 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting In re N.E., N.L. v. Ind. Dep't of Child Servs., 919 N.E.2d 102, 108 (Ind. 2010)). And these two proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter:

"procedural irregularities, like an absence of clear findings of fact, in a CHINS proceeding may be of such import that they deprive a parent of procedural due process with respect to a potential subsequent termination of parental rights." Id. (quoting In re J.Q., J.Q. v. Ind. Dep't of Child Servs., 836 N.E.2d 961, 967 (Ind. Ct. App. 2005)).

And although the termination of parental rights "is not an inevitable result" of a CHINS proceeding, "[t]here is no question that . . . many petitions to terminate the parent-child relationship grow out of a CHINS action." State ex rel. Gosnell v. Cass Cir. Ct., 577 N.E.2d 957, 958 (Ind. 1991) (declining to hold that "termination of the parent-child relationship was merely the continuing stage of the CHINS proceeding"). We have therefore urged that "an abundance of caution should be used when interfering with the makeup of a family and entering a legal world that could end up in a separate proceeding with parental rights being terminated." In re K.D., 962 N.E.2d at 1259.

It is thus appropriate that a CHINS adjudication is subject to the same due process analysis as a proceeding terminating a parent's relationship with a child. Id. at 1257. That is to say, we balance the three factors laid out by the U.S. Supreme Court in Mathews: "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." Id. (citing In re C.G., 954 N.E.2d at 917); Mathews, 424 U.S. at 335. Ultimately, the resulting balance of those factors must provide "the opportunity to be heard at a meaningful time and in a meaningful manner." Id. at 333.

The question here is whether the CHINS court's failure to actually appoint counsel for J.A., after finding she was entitled to such counsel by virtue of her indigency, was a violation of due process. Both parties agree that both the private and governmental interests are substantial under the three-prong analysis. But they disagree as to the risk of error created when the CHINS court failed to appoint the counsel it told J.A. would be appointed.

12

But <u>Mathews</u> analysis aside, it is also true that "if the State imparts a due process right, then it must give that right." <u>In re C.G.</u>, 954 N.E.2d at 917 (quoting <u>A.P. v. Porter Cnty. Office of Family & Children</u>, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000)). For example, in a TPR proceeding, the State has provided statutory entitlements to "(1) cross-examine witnesses, (2) obtain witnesses or tangible evidence by compulsory process, and (3) introduce evidence on behalf of the parent." <u>Id.</u> (citing Ind. Code § 31-32-2-3(b) (2008)). Likewise, a parent in a TPR proceeding is entitled to representation by counsel. Ind. Code §§ 31-32-2-5, -4-1(2) (2008). The Indiana Code also requires a trial court to appoint counsel for a parent in a TPR proceeding when the parent does not have an attorney to represent his or her interests without conflict and has not waived his or her right to that counsel. Ind. Code § 31-32-4-3 (2008). So if a parent were deprived of representation by counsel at a TPR proceeding, for example, the deprivation would constitute a failure to afford that parent the process to which the General Assembly says he or she is due.

So it is apparent that the CHINS court erred. J.A. waived her right to counsel at the initial CHINS hearing in October 2010, but expressly requested appointed counsel at the February 2011 hearing. And the CHINS court, after conducting an inquiry as to J.A.'s ability to pay for an attorney, concluded that she was unable to afford counsel and told her "Okay. Alright I will appoint the Public Defender Agency to represent you in this matter." (Supp. App. at 14.) It then did not do so even though it had no discretion on the matter, with the result that J.A. was deprived of a statutory right to counsel—and thus the trial court denied her due process.

## II.  The Impact of the Due Process Violation

In their most typical arrangement, CHINS, TPR, and adoption proceedings line up somewhat like dominoes; although one proceeding may not necessarily tip over onto the next, neither can it usually fall without being pushed by the proceeding before it. This has

13

understandably caused us to proceed with concern and trepidation when attempting to reset one of these dominoes after it has fallen in error, as the collateral consequences for the parties (most notably the children) can be harsh and long-lasting. And here, J.A. asks us for a wide-ranging measure of relief, including vacating the trial court order terminating her parental rights with respect to G.P.—even though the proceeding in which the error occurred was the CHINS proceeding.

The CHINS statutes themselves are silent on the question as to what happens when the statutory right to counsel is denied, and neither party suggests any specific standard of review for this situation.[8] The Court of Appeals found any potential error in the CHINS court's failure to follow through with appointing counsel to be harmless, but that determination was made in the context of the third prong of the Mathews analysis—the risk of error created by the failure. In re G.P., 985 N.E.2d at 790–91. And it was not applying a "harmless error" analysis to the denial of a right to counsel—the Court of Appeals simply concluded that, in its view, whether J.A. had counsel or not at the CHINS hearings would not have changed the ultimate outcome of the TPR proceeding, where she did have counsel.

In a number of contexts, Indiana courts have applied a bright-line rule as to the right to counsel—reversing convictions or other judgments when that right is denied. See, e.g., Hawkins, 982 N.E.2d at 999–1002 (Ind. 2013); In re Adoption of G.W.B. & A.M.B., Brooks v. McGee, 776 N.E.2d 952, 954 (Ind. Ct. App. 2002) (judgment granting adoption of children over

___

[8] DCS presents a fundamental error analysis, but the fundamental error concept is a narrow exception to the waiver doctrine in that an "error was so egregious and abhorrent to fundamental due process that the trial judge should or should not have acted, irrespective of the parties' failure to object or otherwise preserve the error for appeal." Whiting v. State, 969 N.E.2d 24, 34 (Ind. 2012). Because we reject DCS's contentions that J.A. waived appellate review and/or invited the error, its fundamental error position is inapplicable here.

parental objection reversed where trial court failed to advise parent of right to counsel guaranteed by statute); In re Petition of McClure, 549 N.E.2d 392, 393–95 (Ind. Ct. App. 1990) (judgment granting decree of adoption reversed by violation of statutory right to counsel, underpinned by constitutional considerations); Taylor v. Scott, 570 N.E.2d 1333, 1335–36 (Ind. Ct. App. 1991) (judgment terminating father's parental rights reversed when trial court failed to advise father of right to counsel after father's counsel withdrew), trans. denied. In none of these circumstances did the denial of the right to counsel require review for its prejudicial impact on the litigant—the denial itself was a prejudice requiring a reversal. But see Hopper v. State, 957 N.E.2d 613, 622–23 (Ind. 2011) (explaining Court's rejection of view that failure to provide statutory advisements on waiver of right to criminal defendant amounted to per se violation of right to counsel). We think this bright-line rule is the right approach to take here, as well.

For one thing, we are not dealing with a *waiver* of the right to counsel as we were in Hopper, where a totality of the circumstances approach is more commonly accepted. See id. Instead J.A. requested counsel, was found to be entitled to it, and never got it—so here we dealing with a literal denial of J.A.'s statutory right to counsel. And while it is not necessary that J.A. show prejudice flowing from the denial, we think the harm seems quite apparent. As she argues here—and as she argued before the trial court—an attorney representing her at the CHINS proceedings could have informed the CHINS court as to the reasons for her absence and her efforts to engage in services, maintain sobriety, and find a healthy support network in Virginia in which to recover.[9] A trained lawyer might also have helped push application of the Interstate Compact on the Placement of Children to place G.P. in Virginia with J.A.'s mother. And a

---

[9] We do not by any means wish to recommend (or commend) J.A.'s actions in leaving the state without informing DCS that she was doing so. But we also think it likely that, had she had an attorney at the time, the attorney might have either convinced her not to pursue this course of action or assisted her in making the necessary arrangements with DCS and the court.

lawyer could certainly have objected to DCS's allegations at the hearings, offered evidence to mitigate the allegations, or advised J.A. not to respond to the allegations of not completing services by saying "we've kind of thrown our hands up in the air." (Supp. App. at 28.) Any of these actions could have changed the tenor and direction of the CHINS process and perhaps prevented the TPR proceeding altogether, and it therefore also seems inappropriate to claim that this error did not result in harm because the outcome of the TPR proceedings would have remained the same. In many ways, the harm *was* the TPR proceedings.

Regardless, the requirement of due process—whether set as a minimum floor by the Due Process Clause of the Fourteenth Amendment or established as something higher by legislative enactment—"embodies a requirement of 'fundamental fairness.'" In re C.G., 954 N.E.2d at 917 (quoting In re E.P., 653 N.E.2d at 1031). And without question it was fundamentally unfair to tell J.A. she would receive appointed counsel, as she was entitled to by statute, and then not follow through with the appointment but instead continue with proceedings challenging her fitness as a parent.

Our conclusion with respect to the CHINS proceeding, therefore, has obvious consequences for the TPR proceeding. This is not a case where the denial of the right to counsel resulted in the *adjudication* that G.P. was a child in need of services—because J.A. admitted to the CHINS allegations at the initial hearing, when she desired to proceed pro se. At that stage, the violation may have less of a collateral impact because the processes are still distinct and an error may be corrected in a TPR proceeding—before the harm becomes permanent. See In re E.P., 653 N.E.2d at 1032 ("However, unlike a termination proceeding . . . where an erroneous result obviously would be disastrous, an erroneous CHINS adjudication has a far less disastrous impact on the parent-child relationship."); see also In re M.M., 733 N.E.2d at 10. But even so, we still have urged caution and restraint at this early step:

16

It is important to take extra time to provide due process for the parents to avoid jeopardizing any termination or adoption proceedings for lack of due process during the CHINS adjudication stage. Such an issue could lead to an even longer length of time for a child to gain ultimate permanency. By focusing on due process of the parents at the CHINS adjudication stage, all parties in the CHINS proceeding ultimately benefit, including the child.

In re K.D., 962 N.E.2d at 1259.

Instead, in this case it was the *subsequent* CHINS proceedings that flowed directly into the termination of J.A.'s parental rights—because the very CHINS hearings where J.A. was denied her right to counsel were those in which her parental participation was cut off as a precursor to the TPR action. For J.A., the two actions are almost inextricably linked and the defectiveness of one inevitably has a destructive collateral impact on the other. As amicus curiae Indiana Legal Services, Inc. phrased it:

A CHINS case does not inevitably lead to a termination proceeding, but a termination must be preceded by a CHINS proceeding. The two proceedings should be viewed as a continuum; the termination case rests on the foundation built during the CHINS case. When that foundation is flawed, the termination proceeding will collapse.

(Ind. Legal Serv's, Inc.'s Amicus Br. on Trans. at 5.) The undoing of the CHINS process here compels the undoing of the TPR process, and we therefore vacate the trial court's judgment terminating J.A.'s parental rights.[10]

---

[10] The impact on G.P.'s adoption, if any, largely starts with J.A. That there might be a collateral effect on an adoption when a termination order is vacated is a concern we have raised in the past, see In re C.G., 954 N.E.2d at 916 n.1, and just recently a case presented us with the opportunity to address certain

17

## Conclusion

J.A. was denied her statutory right to counsel during the course of the CHINS proceedings below and those proceedings flowed directly into an action to terminate her parental rights and (in a separate action) adopt out her child. We therefore vacate the trial court judgment terminating her parental rights.

Dickson, C.J., Rucker, Massa, and Rush, JJ., concur.

---

procedural remedies available to a natural parent in these sorts of situations, In re Adoption of C.B.M. & C.R.M., C.A.B. v. J.D.M. & K.D.M., 992 N.E.2d 687 (Ind. 2013).

But we cannot set aside G.P.'s adoption today because that case is not before us. The appeal before us is the TPR proceeding, whereas in In re C.B.M. the TPR appeal had already been resolved and it was the adoption proceeding itself being challenged. The two actions are distinct cause numbers, filed in separate divisions of the Marion County Superior Court, and overseen by different judicial officers. To the extent the adoption was based upon the TPR judgment, J.A. might have grounds to request relief from that judgment pursuant to Trial Rule 60(B)(7) and consistent with the boundaries set out in In re C.B.M.. But that is an undertaking J.A. must begin herself, independent of this opinion.

Similarly, we cannot simply remand this case to the CHINS court today because it is not clear from the record whether the CHINS cause number remains open still or if G.P. has been discharged from that court's jurisdiction pursuant to Ind. Code § 31-34-21-11 (2008). If the CHINS case is closed and G.P. discharged, and J.A. both challenges and is able to set aside the adoption, DCS (or some other proper party authorized by statute) would have to file a new CHINS petition in order for that court to regain jurisdiction. See Ind. Code § 31-30-2-1(a)(1) (2008); In re A.T., Lake Cnty. Dept. of Child Servs. v. A.T., 889 N.E.2d 365, 367–69 (Ind. Ct. App. 2008), trans. denied.