## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2015, 9:01 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark Small
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

H.B. (Minor Child)

and

T.S. (Alleged Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 30, 2015

Court of Appeals Case No.
49A02-1501-JT-44

Appeal from the Marion Superior Court, Juvenile Division

The Honorable Marilyn A. Moores, Judge, and the Honorable Larry E. Bradley, Magistrate

Trial Court Cause No.
49D09-1407-JT-315

**Mathias, Judge.**

[1] T.S., the alleged father of H.B., appeals the order of the Marion Superior Court terminating his parental rights. On appeal, T.S. claims that the trial court denied him due process by denying his request for a DNA test to establish T.S.'s paternity of H.B.

[2] We affirm.

## Facts and Procedural History

[3] H.B. was born in the spring of 2009 to T.B. ("Mother"), who at the time was married to R.P. ("Presumptive Father").[1] Shortly after the child's birth, Mother was incarcerated in a half-way home. T.S. did not see the child until approximately three months after she was born. When H.B. was approximately nine months old, the child began to live in her maternal grandfather's house with Mother. T.S. then began to live there "off and on" until June 4, 2013, when H.B. was four years old. Tr. pp. 55-56.

[4] In May 2013, the Department of Child Services ("DCS") received a report concerning H.B. During the subsequent investigation, DCS learned that Mother had a history of substance abuse. Mother also informed the DCS caseworker that she believed that T.S. was H.B.'s father. DCS was not informed and did

---

[1] See Ind. Code § 31-14-7-1(1) (2001) noting that a man is presumed to be a child's biological father if the man "and the child's biological mother are or have been married to each other" and the "child is born during the marriage."

not yet know that Mother may have been married to Presumptive Father at the time of H.B.'s birth.[2] DCS did not immediately remove H.B. from Mother's home. However, after further investigation, DCS filed a petition alleging that H.B. was a Child in Need of Services ("CHINS") on June 4, 2013. The petition alleged that H.B. was a CHINS due to Mother's substance abuse, the educational neglect of H.B.'s sibling, and because T.S. had not demonstrated an ability or willingness to parent. The trial court held an initial hearing on June 4, 2013, but T.S. did not appear, despite knowing about the hearing date.

[5] On June 11, 2013, as a result of Mother's continuing use of illicit drugs, DCS removed H.B. from Mother's care and placed her with Mother's relatives. Another hearing was held on June 14, 2013, at which T.S. appeared and requested and received the appointment of counsel on his behalf.

[6] At a hearing held on June 20, 2013, the trial court found H.B. to be a CHINS based on Mother's admissions. Both T.S. and his counsel failed to appear. The trial court held another hearing on July 18, 2013. T.S. again failed to appear in person, but his counsel appeared on his behalf. At the August 15, 2013, dispositional hearing, T.S. again failed to appear in person, but he was represented by counsel. At the August 15 hearing, the trial court ordered T.S. to submit to DNA testing to establish paternity.

---

[2] Apparently, at some point, Mother and Presumptive Father divorced; during the CHINS investigation, DCS asked Mother if she was married, and she replied that she was not. Tr. pp. 64-65.

[7] At the October 31, 2013 review hearing, T.S. failed to appear in person but was represented by counsel. The trial court ordered H.B. to remain in relative foster care. Yet again, at the February 13, 2014 review hearing, T.S. failed to appear in person, but his counsel was present.

[8] On May 15, 2014, the trial court held another review hearing. This time, T.S. appeared both in person and by counsel and requested services and paternity testing. The trial court, however, denied this request. It also rescinded its earlier order requiring T.S. to undergo paternity testing because Mother indicated that she may have been married to Presumed Father at the time of H.B.'s birth. Up to this point, DCS was unaware of Mother's marriage to Presumed Father.

[9] A permanency hearing was held on June 19, 2014. Yet again, T.S. failed to appear in person, appearing only by counsel. The trial court changed the permanency plan to adoption. T.S.'s counsel requested that T.S. be provided with services. DCS requested that Presumed Father be added to the CHINS petition because he had been married to Mother at the time of H.B.'s birth. The trial court denied T.S.'s request but granted DCS's request.

[10] DCS filed a petition to terminate parental rights on July 17, 2014. At the July 25, 2014 initial hearing, T.S., failed to appear in person choosing to appear only by counsel. The trial court appointed a guardian *ad litem* for H.B. At the review hearing held on September 25, 2014, T.S. yet again failed to appear in person, but his counsel was present and informed the court that T.S. had not been in contact with him.

[11]     At a pre-trial hearing held on September 26, 2014, T.S. appeared in person and by counsel and requested mediation, which the trial court granted. Another pre-trial hearing was held on November 7, 2014. T.S. again did not appear, but his counsel did and noted that T.S. had left the mediation. A week later, at another pre-trial hearing, T.S. did not appear in person, but his counsel was present and again noted that T.S. had "showed for, and then left from the mediation hearing in this matter." Appellant's App. p. 44.

[12]     The trial court held an evidentiary hearing on the petition to terminate parental rights on December 30, 2014. T.S. appeared for this hearing in person and by counsel. At the hearing, T.S. testified that he did not appear at most of the hearings because he had an outstanding warrant for his arrest due to a probation violation. He also claimed that he was unaware of the trial court's order to undergo paternity testing. T.S. stated that, once his probation issue was resolved,[3] he requested paternity testing but thought he had to wait until Presumed Father had been "dismissed" as the legal father before it could be determined whether T.S. was, in fact, H.B.'s father. Tr. p. 16. T.S. also admitted to having an opiate addiction. He claimed to have stopped using after H.B. was removed but admitted to having relapsed at least once since then. At the time of the termination hearing, T.S. had been living with his mother for

---

[3] T.S. was incarcerated for forty-five days as a result of violating his probation. This probation apparently stemmed from T.S.'s May 2013 conviction for theft. In addition to this conviction, T.S.'s criminal record includes convictions for criminal mischief, trespass, operating while intoxicated, attempted theft, receiving stolen property, burglary, and possession of marijuana.

approximately one year. He was unemployed and had not been employed for a year and a half. He relied on food stamps and his mother's care to survive, and also did "side jobs." Tr. p. 26.

[13] The trial court also heard evidence that H.B. was in relative foster care with her sibling. H.B. was bonded with her sibling and was doing well. H.B. desired to stay with the relative foster parents, and the permanency plan was adoption. T.S. had not seen H.B. for seventeen months. He had not asked DCS for visitation for over a year. When asked whether he wanted H.B. to be placed in his care, T.S. was equivocal, stating:

> *Depends if she's mine or not*. If she is mine then I'll take steps, working with the Court and the people that own them or have them, I guess, that are taking care of them and whatever further bests them [sic] is in my best interest *and if it's not me, then so be it the[n]*."

Tr. p. 21 (emphasis added). T.S. also admitted that it was in H.B.'s best interests to stay with her sibling, who was also placed with the current foster parents.

[14] The DCS case manager testified that termination of parental rights was in H.B.'s interest. The case manager also noted that T.S. had not provided DCS with any documentation to support his claims that he had addressed his substance abuse problems or that he had appropriate housing, employment, or income to care for the child. The court-appointed special advocate testified that adoption by the current foster parents was in H.B.'s best interests. The trial

court issued an order on January 5, 2015, terminating T.S.'s parental rights to H.B. T.S. now appeals.

## Discussion and Decision

Our supreme court recently reiterated that:

> Due process protections bar state action that deprives a person of life, liberty, or property without a fair proceeding. It is unequivocal that the termination of a parent-child relationship by the State constitutes the deprivation of an important interest warranting deference and protection, and therefore [w]hen the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process.

*In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (citation and internal quotations omitted).

However, the mere biological link between a putative father and a child does not by itself warrant significant constitutional protection. *In re Paternity of M.G.S.*, 756 N.E.2d 990, 1005 (Ind. Ct. App. 2001), *trans. denied*. Still, an unwed father has a constitutionally protected inchoate or "opportunity" interest for a relationship with his child. *Id.* (citing *Lehr v. Robertson*, 463 U.S. 248, 261-64 (1983)). If a putative father has "grasped this opportunity by demonstrating a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his parental rights with respect to that child ripen into an interest which is entitled to substantial protection under the Due Process Clause." *Id.*

[17] Pursuant to Indiana Code section 31-14-7-1(1), a man is presumed to be a child's biological father if the man and the child's biological mother are or have been married to each other and the child is born during the marriage. *See In re I.J.*, ___ N.E.3d ___, 2015 WL 4111706 at *3 (Ind. Ct. App. July 8, 2015). This presumption of fatherhood may be rebutted by direct, clear, and convincing evidence that someone else is the father. *Id.* (citing *Minton v. Weaver*, 697 N.E.2d 1259, 1260 (Ind. Ct. App. 1998)); *see also In re Paternity of Infant T.*, 991 N.E.2d 596, 600 (Ind. Ct. App. 2013) (noting that paternity may be only indirectly "disestablished" once it has been established in another man),[4] *trans. denied*. One method for rebutting the presumption that a mother's husband is the father of the child is with genetic test results demonstrating greater than a 99% probability that another man is the father. *In re I.J.*, ___ N.E.3d at ___, 2015 WL 4111706 at *3 (citing I.C. § 31-14-7-1(3)).

[18] Here, T.S. claims that because he had been part of H.B.'s life, the trial court deprived him of due process when it denied his request for DNA testing and parenting services. We disagree.

[19] First, T.S.'s claims regarding his involvement with H.B.'s life are supported only by T.S.'s own testimony, which the trial court was not required to believe, even if it was, as he claims, uncontradicted. *See Wood v. State*, 999 N.E.2d 1054, 1064 (Ind. Ct. App. 2013) (noting that the trier of fact is not required to believe

---

[4] This to avoid having a child declared a *filius nullius*, or "son of nobody," which would carry with it countless detrimental financial and emotional effects. *Id.*

a witness's testimony even if it is uncontradicted). Moreover, evidence exists that T.S. lived with Mother and H.B. "off and on" until June 4, 2013, after DCS became involved. T.S then left H.B. with Mother even though he knew about Mother's substance abuse problems.

[20] Nor can we turn a blind eye to the fact that, during the year prior to the termination hearing, T.S. did not ask about visiting H.B. When asked about if he wanted H.B. to be in his care, T.S. gave what can be considered, at most, an unenthusiastic response: "Depends if she's mine or not. . . . [A]nd if it's not me, then so be it[.]" Tr. pp. 21, 31. This is not the response of a father emotionally bonded with his child.

[21] With regard to the issue of paternity testing, T.S. frames the issue as one of the trial court denying his request for genetic testing. This, however, overlooks that the trial court initially *ordered* T.S. to establish paternity of H.B. Instead of doing so, T.S. ignored the trial court's order and absented himself from the proceedings for approximately nine months. T.S. attempts to excuse his behavior by pointing to the fact that he did not want to come to court because of the warrant for his arrest as a result of his probation violation. However, this does not excuse his total lack of compliance with the trial court's order for nine months or his repeated failure to appear. T.S. could well have established paternity outside of the courtrooms he wished to avoid, allowing his appointed counsel to present the result in a subsequent hearing.

[22]     Moreover, as noted by the trial court, H.B. was born in 2009, and the CHINS case was not filed until 2013. During this four year period, T.S. did absolutely nothing to establish his paternity of H.B. T.S. even admitted that he knew he needed to establish paternity as early as February 2012. Although he claimed to have completed a DNA swab kit, he failed to turn it in for testing. As explained above, he also ignored the trial court's initial order to establish paternity.

[23]     We are therefore faced with a situation where T.S. apparently believed himself to be the father of H.B. from a very early point in the child's life. Instead of establishing paternity on his own, he did nothing. When DCS became involved, T.S. left H.B. with Mother despite her obvious and serious drug problem. When the trial court ordered him to establish paternity, he ignored the order. T.S. also failed to appear at most of the CHINS hearings for fear of being arrested on an outstanding warrant. Under these facts and circumstances, we cannot say that the trial court "denied" T.S. the opportunity to establish his paternity of H.B. To the contrary, T.S. had plenty of opportunities to establish paternity but failed to take advantage of any of them. Therefore, we cannot say that the trial court deprived T.S. of due process by denying his request for genetic testing after it was discovered that H.B. had a presumptive legal father.

[24]     T.S. also claims that termination of his parental rights violates the due process rights of someone not yet determined to be the father of a child. However, we have long held that a parent-child relationship may be terminated even though paternity has yet to be established. *In re C.C.*, 788 N.E.2d 847, 851 n.1 (Ind. Ct. App. 2003), *trans. denied* (citing *In re A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App.

1992)). Moreover, if T.S. had complied with the trial court's initial order to establish paternity, DCS would have been able to provide services to him. Instead, T.S. absented himself from the proceedings for nine months, and this, after he failed or refused to establish paternity for the first four years of H.B.'s life. Again, under these facts and circumstances, we cannot say that T.S. was deprived of due process.

## Conclusion

[25] Having concluded that the trial court did not deprive T.S. of due process by denying his request for genetic paternity testing, we affirm the order of the trial court terminating whatever parental rights T.S. may have to H.B.

[26] Affirmed.

Baker, J., and Bailey, J., concur.