## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 30 2020, 9:57 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nicole A. Zelin
Pritzke & Davis, LLP
Greenfield, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of: R.P. Jr. (Minor Child) and R.P. (Father) | September 30, 2020 |
| | Court of Appeals Case No. 20A-JT-872 |
| R.P. (Father), | Appeal from the Hancock Circuit Court |
| *Appellant-Respondent,* | |
| v. | The Honorable R. Scott Sirk, Judge |
| | Trial Court Cause No. 30C01-1909-JT-307 |
| Indiana Department of Child Services, | |
| *Appellee-Petitioner* | |

**Vaidik, Judge.**

# Case Summary

[1] R.P. ("Father") appeals the termination of his parental rights to R.P. Jr. ("Child"). We affirm.

# Facts and Procedural History

[2] Father and T.P. ("Mother") are the biological parents of Child, born in 2011. Mother signed a consent to Child's adoption and does not participate in this appeal. Therefore, we limit our narrative to the facts relevant to Father.

[3] Father has an "extensive and consistent" criminal history that has led to his incarceration for most of Child's life. Appellant's App. Vol. II p. 19. In 2013, when Child was two years old, Father was arrested for robbery as a Class B felony and sentenced to eight years. In February 2017, while Father was still incarcerated, the Department of Child Services (DCS) received reports that Mother was caring for Child and his siblings while under the influence of illegal substances. Later that month, Mother was arrested. As there were no available caregivers, DCS removed Child from the home. On February 23, 2017, DCS filed a petition alleging Child and his siblings were Children in Need of Services (CHINS). A month later, the trial court held a fact-finding hearing, and Father appeared in custody. The court informed Father of his rights in the proceeding, including that he had the right to an attorney, and asked how he wished to proceed. Father then expressed confusion at his involvement in the proceeding, given he had been incarcerated for the past four years. The court responded:

"As the Father you can proceed by admitting the CHINS which is what Mother has done. You can proceed by denying the CHINS. You can ask for counsel." *Id.* at 86. Father then admitted Child was a CHINS. The court ordered Father to participate in reunification services, including making weekly contact with the family case manager (FCM), participating in FCM-recommended programs, obeying the law, attending scheduled visits, and providing Child with a safe and secure environment.

[4] In March 2018—over a year after the fact-finding hearing—Father was released on parole. While on parole, Father failed to maintain consistent contact with FCM John West and FCM Connor McCarty—forcing them to communicate with him via his parole officers and a private investigator. Although he received notice and reminders from DCS, Father failed to appear at any CHINS review hearings when not in custody. And despite receiving numerous referrals for services—for domestic-violence classes, substance-abuse rehabilitation, fatherhood-engagement classes, and therapeutic supervised visits with Child— Father either never initiated the service or it was ultimately closed out unsuccessfully due to his lack of engagement.

[5] While on parole from March 2018 to July 2019, Father never achieved stable housing or employment, changing residences "three times in nine months" and holding "two or three jobs in that time." *Id.* at 24. Father also failed to make progress on his substance abuse. In May 2018, he tested positive for amphetamine and cocaine. Throughout his parole, Father tested positive for illegal substances four additional times. In October 2018, methamphetamine

was discovered at Father's residence, leading to his arrest and incarceration, although he was released that same month. In June 2019, Father was unsuccessfully discharged from his substance-abuse services at Volunteers of America due to non-compliance. In July 2019, Father's parole was revoked due to the repeated positive drug tests, and he was reincarcerated.

[6] Father has not seen Child—now nine years old—since he was eighteen months old. In February 2019, DCS attempted therapeutic visits—beginning as supervised phone calls—between Father and Child. However, when these calls were attempted, Father could not be reached and never provided updated contact information. DCS later attempted a similar plan with letters, of which Father wrote only two to the Child.

[7] In September 2019, DCS filed its termination petition. Fact-finding hearings occurred in November 2019 and March of this year. Father was represented by counsel during these proceedings. FCM West and FCM McCarty both detailed Father's consistent lack of engagement with DCS: his failure to communicate, non-compliance with services, and ongoing involvement with criminal activities. Michael Easton, Father's parole officer, testified that Father was "in worse shape by the end of his time [on parole] in July 2019 th[a]n even at the start of his time." Tr. pp. 87-88. Katherine Merchant, a mental-health counselor at Volunteers of America who began working with Father in 2018, stated that his repeated non-compliance in group therapy and the substance-abuse services led to his discharge from the program, and she felt Father was at a "huge risk of relapse." *Id.* at 115. Phyllis Watkins, Child's Court Appointed Special

Advocate, testified that Child does not remember Father and has no interest in forming a relationship with him. Finally, Father testified, stating that he had made "some" effort to get his son back but that his substance-abuse issues and incarceration "extensively" disrupted the case. *Id.* at 127, 130-31.

[8] After the hearing, the trial court issued an order terminating Father's parental rights.

[9] Father now appeals.

# Discussion and Decision

## I. Due Process

[10] Father contends his due-process rights were violated by the CHINS court's failure to appoint counsel for him before holding the fact-finding hearing and accepting his admission that Child was a CHINS. Appellant's Br. pp. 9-13. As an initial matter, it does not escape us that Father did not raise a due-process claim before the trial court, and thus we may consider it waived. *See Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006). However, we prefer to resolve due-process claims on the merits.

[11] When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014). Determining what process is due involves balancing three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government

interest supporting use of the challenged procedure. *Id.* at 1165-66. Here, both the private and government interests are substantial. Therefore, our task is to determine the risk of error created when Father did not have counsel at the CHINS fact-finding hearing.

[12] In determining the risk of error created by the State's chosen procedure, we keep in mind that due-process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children. *Id.* at 1165. "[T]hese two proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter." *Id.* However, where lack of counsel results in a child being adjudicated a CHINS, there is "less of a collateral impact because the processes are still distinct and an error may be corrected in a TPR proceeding—before the harm becomes permanent." *Id.* at 1168 (citing *In re E.P.*, 653 N.E.2d 1026, 1032 (Ind. Ct. App. 1995) ("However, unlike a termination proceeding . . . where an erroneous result obviously would be disastrous, an erroneous CHINS adjudication has a far less disastrous impact on the parent-child relationship.")).

[13] Here, Father contends that the trial court deprived him of due process by not appointing counsel and instead accepting his admission that Child was a CHINS "despite [his] stated confusion" at the fact-finding hearing. Appellant's Br. p. 12. This mischaracterizes the record. At the hearing, Father was informed by the trial court that he had the right to an attorney if he wanted to request one. Appellant's App. Vol. II p. 85. Father then stated that he was confused

because he had "no knowledge of [Mother] doing any of this stuff" and he did not "see how [he] take[s] part in this case considering [he has] been incarcerated for four years." *Id.* at 86. Father's confusion was not about his right to counsel, but as to his role in the proceeding. The court then reiterated his options, telling him he could proceed by admitting, denying, or asking for counsel. Father opted to admit, never indicating he wanted counsel, despite being told twice by the court that he could request counsel. As such, Father was not denied counsel, and there is no due-process violation.

[14] Furthermore, Father does not say how not having counsel during the CHINS fact-finding hearing prejudiced him in the termination proceeding. He does not tell us what would have been different had he had counsel at the hearing. As Mother had admitted Child was a CHINS and Father was incarcerated, it is hard to see how the outcome of the hearing would have been different. Thus, the risk of error in Father's lack of counsel at the CHINS fact-finding hearing is minimal.

[15] For these reasons, Father has failed to show that not having counsel during the CHINS fact-finding hearing created such a risk of error that the termination order requires reversal.

## II. Sufficiency

[16] Father also argues that DCS did not prove the statutory requirements for termination by clear and convincing evidence. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility.

*In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[17]     A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds

that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[18] Father challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[19] Here, Child was initially removed from the home due to Mother's substance abuse and Father's incarceration and inability to provide care or supervision for Child. Father contends his continuing periods of incarceration prevented him from participating in DCS services and that this failure to participate actually "precluded the court from being able to determine whether there was a reasonable probability that Father's prior substance abuse issues could not be resolved." Appellant's Br. p. 16. We disagree. At no point in the almost three-year CHINS case did Father show significant progress on his substance-abuse issue. While on parole in 2018, Father tested positive for illegal substances within a few months of his release. He subsequently tested positive another four times within his sixteen-month parole, leading to his reincarceration. Father has

failed to complete any substance-abuse treatment referred to him by DCS or his parole officer. Finally, his mental-health counselor believes Father is at a "huge risk of relapse." Tr. p. 115.

[20] Furthermore, Father's substance abuse is far from the only conduct that prevents him from providing a safe and stable home. Father has an "extensive and consistent" criminal history, leading to his incarceration for most of Child's life. Appellant's App. Vol. II p. 19. Since Child was two years old, Father has only been free from incarceration for any substantial period while on parole from March 2018 to July 2019, during which he was once briefly incarcerated. This parole was eventually revoked due to numerous violations. Father's incarceration was the reason Child was initially removed from his care, and Father's behavior has shown this is unlikely to change. Additionally, during his brief period of non-incarceration during the CHINS proceedings, Father lacked stable housing and employment. DCS provided Father with services to address his history of substance abuse and domestic violence and to aid in establishing a bond with his son. Repeatedly, Father failed to participate in, or even initiate, these services. Father did not remain in contact with DCS despite its efforts. Father fails to demonstrate that he was any closer to providing Child a safe, stable home than he was at the beginning of the CHINS case. As such, the trial court did not err when it concluded that there is a reasonable probability that

the conditions resulting in Child's removal and continued placement outside Father's home will not be remedied.[1]

[21] Affirmed.

Bailey, J., and Weissmann, J., concur.

---

[1] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied, we need not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires trial courts to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.