**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Aug 28 2014, 9:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**TIMOTHY E. STUCKY**
Blume, Connelly, Jordan,
Stucky & Lauer, LLP
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINA D. PACE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT- CHILD RELATIONSHIP OF: | ) ) ) ) | |
| D.S. (MINOR CHILD) | ) ) | |
| AND | ) ) | |
| T.S. (MOTHER) | ) ) | |
| Appellant/Respondent Below, | ) ) | |
| vs. | ) ) | No. 02A05-1401-JT-37 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES | ) ) ) | |
| Appellee/Petitioner Below. | ) | |

**August 28, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

T.S. ("Mother") appeals the termination of her parental rights to her daughter D.S. She argues that there is insufficient evidence to support the trial court's termination order. But throughout this case—and despite medical evidence—Mother refused to believe that D.S. was molested. Mother also failed to comply with the court's order that she consistently exercise parenting time and complete therapy necessary to help D.S. recover from being molested. We therefore conclude that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship. We affirm.

**Facts and Procedural History**

Mother gave birth to D.S. in 2004. In 2011 the Allen County Department of Child Services (ACDCS) learned that D.S., who was living with Mother in Fort Wayne at the time, had accused two men of sexually molesting her. D.S. was removed from Mother's care and placed with her father.[1] But a short time later, D.S. was removed from her

---

[1] D.S.'s father does not participate in this appeal.

father's care due to allegations that he had physically abused her. At this time, ACDCS also learned that Mother was homeless. D.S. was placed in foster care.

Medical records confirmed that D.S. had been molested, and ACDCS substantiated the claims of molestation and physical abuse. Tr. p. 304-06. In August 2011 ACDCS filed a petition alleging that D.S. was a child in need of services (CHINS) due to neglect, sexual abuse, and physical abuse. Appellant's App. p. 24. Mother admitted that D.S. was a CHINS, and the court adjudicated D.S. a CHINS. Mother was ordered to do a number of things to enable reunification, including:

- Cooperate with all caseworkers and the guardian ad litem (GAL) assigned to the case
- Maintain clean, safe, and appropriate housing
- Successfully complete a drug and alcohol assessment and follow all related recommendations
- Successfully complete home-based therapy
- Attend all scheduled parenting time with D.S.
- Participate in therapy with D.S.

*Id.* at 32-36.

After some initial resistance, Mother completed several of the services required. But critically, Mother was ordered to participate in therapy with D.S. that was designed to help D.S. "heal from the sexual and physical abuse . . . and prepare her to reunify with [Mother]." Tr. p. 135. The therapist working with D.S., Dr. Therese Mihlbauer, explained to Mother that her cooperation in treatment was important because it would allow D.S. to understand that "once she went home . . . [Mother] would keep her safe and understand what she needed as far as recovering from sexual abuse." *Id.* at 137. Mother never completed this therapy; at first, she refused to believe that D.S. had been molested, and later, she refused to cooperate with the therapists. In late 2012 Mother moved from

3

Fort Wayne to Indianapolis, and in 2012 and 2013 she failed to attend many scheduled parenting-time sessions with D.S. In early 2013 ACDCS filed a petition to terminate Mother's parental rights. The trial court held three hearings on the termination petition in October 2013.

At the first hearing,[2] Mother testified that she did not believe that D.S. had been molested because "[D.S.] fantasizes." *Id.* at 63. Mother said that she would tell D.S. that she believed her, even if she did not:

> [I]f it comes to my child and she's asking me, yeah, I'm gonna tell her I believe her all day or whatever. But in reality—and this is what we in [sic], we're in reality, as you—I don't think you all understand that though, but we're in reality right now, like real life. It's . . . already been found out that she fantasizes stuff . . . so no, I don't believe that she was molested by those set of people because there's no way they were ever around her.

*Id.* at 108. When asked if Mother believed that D.S. had been molested by anyone, she said no. *Id.*

Dr. Mihlbauer testified about working with D.S. and Mother. The doctor explained that she was unable to work with Mother at first because Mother demanded "proof that [D.S.] has been sexually abused and told me that she didn't believe that she had been sexually abused." *Id.* at 136. Dr. Mihlbauer told Mother that she could not work with her until she acknowledged that D.S. had been molested "because [] my treatment plan is to help [D.S.] communicate with her mother and her mother to help her with that . . . ." *Id.* at 137. Three months later, Mother contacted Dr. Mihlbauer and said that she now believed that D.S. had been molested. *Id.* at 138. Dr. Mihlbauer arranged to meet with Mother.

---

[2] Mother did not attend the other two hearings.

Mother's first two sessions—one session included D.S.—with Dr. Mihlbauer went well. *Id.* at 140-41. Things began to change during the third session, however. During that session, Mother became angry with Dr. Mihlbauer for redirecting D.S., which upset D.S. *Id.* at 142. After a brief break between sessions—Mother gave birth to another child during this time—therapy resumed in August 2012. Mother struggled to communicate with D.S. when therapy continued. Dr. Mihlbauer reminded Mother that "the goal is communication between mother and daughter," and asked Mother to pick a topic to talk about with D.S. *Id.* at 144. When Mother refused, D.S. asked to talk about her infant brother, whom Mother brought to the session. *Id.* at 145. Mother refused. D.S. pressed on, telling Mother that she felt Mother focused on the baby during the session. Mother replied that she would not bring the baby to therapy anymore. *Id.* Dr. Mihlbauer suggested that it might be good for D.S. to develop a relationship with her brother before she moved home, but this angered Mother. Mother's anger toward the doctor upset D.S. Later, Dr. Mihlbauer suggested that she and Mother meet alone for a time because Mother's behavior upset D.S. *Id.* at 146. Mother refused, and at the end of the session, Dr. Mihlbauer asked Mother not to come back until the doctor could speak with Mother's caseworker. *Id.* Mother was ultimately referred to another therapist, Vanessa Jones.

Mother's experience with Jones was also unsuccessful. During their first session, Jones tried to administer an assessment to Mother. Jones recalled that Mother "was not forthcoming with information and stated that she didn't know why she was there." *Id.* at

5

234. Mother's behavior prevented Jones from completing the assessment. *Id.* Jones described their second session as equally unproductive:

> [Mother's] appointment was at one [] o'clock. When I went to the lobby to invite her back to my office, she was on the phone, which was against our company's policy. I asked her to end her phone call and to let the front desk know when she was off the phone so that I could come back and get her. It wasn't until 1:28 that she got off the phone, and I went back out to get her, and she decided that she needed to use the restroom. And so she didn't actually get back into my office until 1:35.

*Id.* at 235-36. When the session finally began, Jones "talked to [Mother] about her avoidant behavior and [Mother] became quite angry and verbally aggressive." *Id.* at 236. Jones described Mother as having a "hostile tone, elevated volume, and reluctance to cooperate." *Id.* Despite this, Jones scheduled another session for November 2012. Mother did not attend the session, and she did not provide adequate notice that she would not attend. *Id.* at 237. Mother also failed to attend the next scheduled session, and gave no notice that she would not attend. *Id.* As a result, Jones notified Mother's caseworker that she had closed Mother's case. *Id.*

Mother's family case managers, FCM Carolyn Warren and FCM Rachael Hudgins, expressed concern about Mother's failure to complete all the required services—particularly therapy—and her refusal to believe that D.S. was molested. FCM Hudgins described one meeting with Mother and other caseworkers:

> [W]e reviewed the information that we had received and what [D.S.] had disclosed through the [child advocacy center] and shared that with her and shared the – basically the findings that it appeared that yes, the child – you know, yes the child was sexually abused, and just shared with her, you know what the [D.S.] had said.

6

*Id.* at 219. Despite this evidence, Mother maintained that "she believed that [D.S.] was coached to say these things and that [D.S.] was not being truthful." *Id.*

FCM Warren testified that Mother had not fully complied with the court's order. She explained that between July 2012 and March 2013, Mother missed many scheduled parenting-time sessions with D.S. This pattern worsened in 2013: between March and October 2013, Mother attended only five of twenty-five scheduled parenting-time sessions. *Id.* at 259-60; *see also id.* at 190. FCM Warren also noted that Mother had been uncooperative with multiple service providers throughout the case, not just Dr. Mihlbauer and Jones. *Id.* at 262-65. Echoing FCM Hudgins' testimony, FCM Warren recommended terminating Mother's parental rights, saying that Mother continued to "deny and not work on the issue of [D.S.'s] sexual abuse" and "was unwilling to participate in counseling to learn about boundaries and to learn about what [D.S.] would need in order to heal from the sexual abuse . . ." *Id.* at 270. FCM Warren worried that if Mother "was not willing to look at the problem, then [D.S.] may be put in the very same situations based on Mother's denial." *Id.*

Roberta Renbarger, the GAL assigned to the case, also recommended terminating Mother's parental rights. GAL Renbarger testified that her chief concern was Mother's attitude about D.S.'s molestation:

> I'm really concerned with Mother's refusal to believe that [D.S.] was molested. She gave lip service to it briefly, saying she believed it, but more than once she and I had a pretty in-depth conversation after more than one hearing in which she vigorously stated that [D.S.] was a liar and that she didn't believe that anything happened to her. I asked if she had seen the medical reports and the pictures that showed that there were physical findings that this child was in fact molested, if not raped. She said that she didn't believe it and that it just wasn't true, that [D.S.] just made it all up. I

said, "where would she – where would a child come up with the kind of sexual detail that this child had at the tender age of five and a half []?" And she said that it didn't matter, that someone told her to say that. It greatly concerned me that Mother would take no ownership of the fact that the child had been molested and that she needed to buy into that and believe it so that she could support the child through therapy and through her recovery. It was – and this was late in the case. Early in the case, I understood that maybe she wouldn't believe it; but late in the case, after all the therapy and after all of the services provided, Mother still believed that [D.S.] was lying. I had concerns as to whether she would, thereafter, be able to help the child recover from the trauma.

*Id.* at 301-02.

The trial court took the matter under advisement. In January 2014 the trial court entered its order with findings terminating Mother's parental rights. Appellant's App. p. 4-9.

Mother now appeals.

**Discussion and Decision**

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted). A

8

parent's rights may be terminated if the parent is unable or unwilling to meet his or her parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.* (citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

A petition to terminate parental rights must allege:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is

> removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's judgment as to subsection (B) of the termination statute.

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, ACDCS was required to establish, by clear and convincing evidence, only one of the three requirements of subsection (B). Because we find it to be dispositive, we address only the arguments regarding subsection (B)(i); that is, whether there was a reasonable probability that the conditions resulting in D.S.'s removal or the reasons for her placement outside Mother's home would be remedied.

In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re*

*E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted).  We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* (quotation omitted). When considering this issue, courts may take into account any services offered by DCS and a parent's response to those services.  *In re L.B.*, 889 N.E.2d 326, 339 (Ind. Ct. App. 2008), *overruled on other grounds by In re G.P.*, 4 N.E.3d 1158 (Ind. 2014). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied.* Additionally, the failure to exercise parenting time with one's child may demonstrate a lack of commitment to preserving the parent-child relationship.  *L.B.*, 889 N.E.2d at 339.

Here, the trial court concluded that there was a reasonable probability that the conditions resulting in D.S.'s removal from Mother's care or placement outside her home would not be remedied. The court was primarily concerned with Mother's failure to participate in therapy and parenting time and her cynicism about D.S.'s molestation, explaining that:

> [Mother] has not cooperated with family therapy designed to restore a healthy relationship with her daughter. By refusing to accept the child's accusations of molestation and this court's factual findings in the underlying CHINS case, [Mother] has precluded herself from building a trust relationship with her daughter and has failed to provide her with the sense of safety and protection she needs. The court concludes that, based on Dr. Mihlbauers's testimony, [] a successful reunification cannot occur until the child's safety needs are properly addressed.  The mother has not completed individual therapy and has not regularly visited the child. She has been resistant to therapeutic interventions.

11

Between March 2013 and October 5, 2013, [] Mother was afforded supervised [parenting time] with the child . . . for two-hour blocks of time once a week. Advising that she was bored [] Mother requested that either the visits be transferred to community-based visits or reduced to one-hour sessions. Of the twenty-five (25) visits scheduled only five (5) occurred. Some were cancelled due to Mother reporting transportation problems from Indianapolis to Fort Wayne.

[M]other was referred to therapy with Vanessa Jones . . . in November 2012. From the testimony of therapist Jones the court finds that she saw [] Mother on two (2) occasions. An assessment was begun at the first session but it was not fully completed. And a second appointment was set for November 15, 2012. On that date the therapist went into the waiting area and found that [] Mother was on the telephone despite it being time for the session to begin. [] Mother refused to terminate the call and continued her conversation for twenty-eight minutes. She then went to the restroom. When confronted about causing a delay [] Mother became angry with [] Jones. The assessment could not be completed due to [] Mother's behavior. The referral was subsequently closed.

Appellant's App. p. 7-8. The trial court also noted the GAL's recommendation that Mother's parental rights be terminated. *Id.* at 8.

The evidence presented at the termination hearings supports these findings. Dr. Mihlbauer and Vanessa Jones testified that they were unable to provide services to Mother because she was confrontational and noncompliant. Mother's family case managers testified that she failed to exercise parenting time consistently with D.S. in 2012 and 2013. They also explained how her refusal to accept that D.S. had been molested and participate in therapy with D.S. threatened the parent-child relationship, as well as D.S.'s future safety and recovery.

In arguing that the evidence does not support termination, Mother contends that she did not believe that D.S. had been molested because D.S. had never been molested or touched improperly in her presence. Appellant's Br. p. 14. But the record does not

12

suggest that the molestation occurred in Mother's presence, and if that was indeed the allegation, this would be a very different case. Rather, the record shows that those involved in the case confronted Mother with medical records and other evidence showing that her daughter had been molested. Despite this evidence, Mother refused to believe that D.S. was molested and repeatedly stated—even at the termination hearing—that D.S. was lying or fantasizing. Importantly, Mother's belief about the molestation was not the only thing that prevented her from being reunited with her daughter. Mother failed to comply with the court's order by failing to consistently exercise parenting time, attending only five of twenty-five scheduled parenting-time sessions in an eight-month period. And Mother's confrontational and uncooperative behavior prohibited her from completing court-ordered therapeutic services that service providers and caseworkers told her were necessary for reunification.

We conclude that the evidence supports the trial court's determination that there was a reasonable probability that the conditions resulting in D.S.'s removal or the reasons for her placement outside Mother's home would not be remedied.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.