# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 25 2019, 9:28 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anna Onaitis Holden
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of B.B. (Minor Child)

and

A.B. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 25, 2019

Court of Appeals Case No.
18A-JT-633

Appeal from the Knox Superior Court

The Honorable Gara U. Lee, Judge

Trial Court Cause No.
42D01-1705-JT-12

**Bailey, Judge.**

# Case Summary

A.B. ("Mother") appeals[1] the trial court's order involuntarily terminating her parental rights to B.B. ("Child"), born March 3, 2015. She raises one issue on appeal which we restate as: whether the Indiana Department of Child Services ("DCS") violated Mother's due process rights by failing to ensure she had an opportunity to address DCS's concerns about her mental health.

We affirm.

# Facts and Procedural History

On November 17, 2015, DCS filed a petition alleging Child was a Child in Need of Services ("CHINS") because Mother and Father (collectively, "Parents") engaged in domestic violence while Child was in the home; Parents used illegal drug substances while Child was present in the home; there was little food and no heat in the home; and Parents were arrested and incarcerated in relation to domestic violence charges. Mother informed DCS that she was depressed and anxious and had "some kind of antisocial disorder." Ex. at 128. Mother admitted Child was a CHINS, and the trial court found Child was a CHINS in orders dated November 23, 2015, and December 21, 2015. Child

---

[1] N.B. ("Father") does not actively participate in this appeal.

was initially placed with her paternal grandmother, then ultimately placed with her maternal great-grandmother who is willing to adopt Child.

[4]     In a December 21, 2015, predispositional report, DCS noted, among other things, that Parents must address their mental health issues, and Mother "will participate in psychiatric and substance abuse services through the Samaritan Center and follow any recommendations." App. at 114. Similarly, the December 21 dispositional order ordered Mother to, among other things: enroll and actively participate in all programs recommended by DCS; keep all appointments with DCS and service providers; refrain from use of alcohol and illegal drugs; submit to random drug screens; and "complete a mental health evaluation and follow all recommendations for treatment." Ex. at 103. However, during the course of the CHINS proceedings, Mother was inconsistent in complying and/or failed to comply with services provided by DCS. Mother failed to consistently submit to required drug screens and, when she did so, frequently tested positive for THC.

[5]     Mother also frequently failed to avail herself of required mental health services. Mother completed a mental health evaluation at Samaritan Center on December 23, 2015, and the evaluation recommended that Mother engage in individual therapy. In January of 2016, Mother attended one out of three therapy sessions, and in February she did not complete any therapy sessions; thus, DCS's March and April 2016 reports to the court noted that Mother's Samaritan Center "[case] is at risk for being closed if she misses one more session." Ex. at 84, 92. Mother was discharged from Samaritan Center on

March 23, 2016, for non-compliance. In May of 2016, DCS provided Mother with home-based individual therapy, but Mother missed two out of five of those sessions, and the therapy was discontinued due to Mother's harassment of the therapist. DCS then submitted a referral for Mother to once again obtain services at Samaritan Center, but Mother failed to attend the evaluation that was scheduled for July 20, 2016. On November 29, 2016, DCS followed the recommendation of its clinical specialist and submitted a referral for Mother to obtain psychiatric testing. Mother scheduled the appointment for that testing for a date in January of 2017. However, in December of 2016, Mother "changed her mind and stated she did not really want to do the testing. [Mother] stated, 'I will if I have to, but if I am not court ordered, I am not going to do it.'" *Id*. at 54.

[6] On January 5, 2017, DCS filed a motion for a hearing to change the permanency plan from reunification to termination and adoption. In doing so, DCS noted that Mother regularly failed drug screens and regularly failed to comply with services. DCS also noted that Mother initially agreed to the recommended psychological evaluation "but has not yet followed through and has indicated she does not intend to." *Id*. at 46. However, Mother did obtain a psychological evaluation on January 9, 2017, which diagnosed her with post-traumatic stress disorder, unspecified bipolar disorder, and paranoid and borderline personality traits. The evaluation recommended "more intensive, ongoing mental health treatment as a pre-requisite for having increased or unsupervised contact with her child." *Id*. at 157.

[7] Following a February 13, 2017 review hearing, the trial court "adopt[ed] the recommendations" in DCS's February 7 report recommending a permanency plan of termination of parental rights. *Id*. at 8-9; 12-13; 32. In doing so, the court noted that: DCS had complied with Child's case plan but Mother had only partially complied; additional services were not required for Parents; the cause of the out-of-home placement of Child had not been alleviated; and DCS had made reasonable efforts to reunify the family and provided family services.

[8] On May 5, 2017, DCS filed a petition to terminate Parents' parental rights. However, DCS continued to provide Mother with mental health services; it referred her to the Samaritan Center and then Hamilton Center for intensive, ongoing mental health services. The trial court held a fact finding hearing on October 23 and November 7 of 2017; at that time, Mother had yet to follow through with the referral to Hamilton Center for mental health services. The Guardian ad Litem ("GAL") had filed a report dated November 6, 2017, which noted, among other things, that Mother had a "lax attitude toward mental health treatment" and recommended termination of parental rights. App. at 47. DCS also submitted into evidence the psychological evaluation of Mother that had been completed on January 9, 2017. Ex. at 147.

[9] On February 7, 2018, the trial court issued an order terminating Mother's parental rights and stating, in relevant part:

\* \* \*

C. FACTS RELATING TO CHILD'S CONTINUED REMOVAL FROM PARENTS' HOME AND CARE: REASONABLE PROBABLITY OF PARENT NOT REMEDYING REASONS FOR REMOVAL, THREAT TO CHILD'S WELLBEING

1. From the outset of the underlying CHINS cause, neither parent consistently complied with services.

* * *

6. Mother admitted at trial that she needed additional therapeutic services to address her violent relationship and mental health diagnoses. Mother claimed that she had been unable to schedule an appointment with the service provider to attend therapy due to being out of minutes on her telephone. Mother consistently had excuses for each missed appointment for various service providers, but the Court finds that Mother's proffered excuses fail to account for her failure to consistently meet with service providers.

7. Mother had threatened Nicole Reed, the prior therapist who provided her services, so a new referral was made to a different service provider. Mother often had angry outbursts which she later admits [sic] are inappropriate and unhelpful to her child. Mother's angry outbursts often occurred when she was confronted with the reality of her case—that she was consistently failing to take advantage of the services offered her. Given the results of her psychological evaluation, the Court finds it highly unlikely Mother will remedy the cause of her angry and threatening outbursts towards various professionals who were only attempting to help her.

8. Due to Mother's angry and occasionally threatening outbursts in person, with service providers, on the telephone, and during

team meetings, the DCS offered Mother a psychological evaluation. Mother successfully complied with the psychological evaluation, which recommended Mother attend therapeutic visitation with the child due to high stress levels reported regarding parenting; intensive on-going therapy for Mother; and parenting skills education. Consistent mental health treatment is a must for Mother, but Mother has failed to consistently attend therapy over the course of two (2) years, and the Court finds it highly unlikely that Mother can remedy her historical lack of consistency and stability with her mental health treatment.

* * *

17. Overall, Mother and Father have failed to remedy the situation that brought about the removal of the child. At trial, Mother admitted that she had no plan regarding where she would live following her release from work release; that she can't take care of herself right now; that she was not compliant with the CHINS orders; that she might be able to be a good mom in one year; and that the child shouldn't have to wait. Based on the pattern of behaviors and continuing pattern of substance abuse, mental health needs, residential instability, employment instability, and violent relationship between both parents, the Court finds that there is not a reasonable probability the situation which brought about the removal of the child is likely to be remedied.

18. Further, Mother's and Father's behaviors during the underlying CHINS cases pose a threat to the well-being of the children [sic]. Mother does not have adequate housing with adequate bedding, food, and clothing for her child. … The risk of Mother and Father continuing to engage in domestic violence is very high, and the Court is not willing to place this child back into a home where the caregivers are violent towards each other. To allow the continuation of the parent child relationship with

Mother and Father would pose a threat to the well-being of the child.

A. [sic] CHILD'S BEST INTEREST & DCS PLAN FOR CARE AND TREATMENT

1. The child's relatives provided support, care, guidance, and supervision in the absence of parents for the majority of the underlying CHINS matter;

2. The child is strongly bonded with her maternal great-grandmother, who has placement of the child;

3. The child is doing well in her current placement;

4. DCS'[s] plan for the child is that she be adopted by the maternal great-grandmother;

5. It is in the best interest of the child to be adopted due to the inability of the Mother and Father to provide appropriate care and supervision for the children [sic], and due to the above findings of this Court;

6. DCS and the Guardian Ad Litem believe that adoption by maternal great-grandmother is in the child's best interest. The child deserves a violence free and stable home. The Court finds that adoption by the maternal great-grandmother is in the child's best interest;

7. Mother's and Father's pattern of substance abuse, domestic violence, and mental instability indicates that maintaining a parent-child relationship with Child is not in the best interests of Child;

13. … [T]here is a reasonable probability that the conditions that resulted in the Child's removal or the reasons for placement outside the home of the parents will not be remedied, and/or that continuation of the parent-child relationship poses a threat to the well-being of the Child;

14. Each paragraph above also demonstrates the Court's finding that termination of the parent-child relationship is in the best interests of the Child, and is expressly adopted as the Court's own finding of fact;

App. at 15-21. Mother now appeals.

# Discussion and Decision

Mother maintains that the trial court's order terminating her parental rights violated her due process rights under the United States Constitution. Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things: (A) that the child has been removed from the parent for at least fifteen of the most recent twenty-two months; (B) that there is a reasonable probability that the conditions resulting in the child's removal will not be remedied or the continuation of the parent-child relationship poses a threat to the child's well-being; and (C) termination is in the best interests of the child. Ind. Code § 31-35-2-4(b)(2).

A parent's interest in the upbringing of his or her child is "perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s]." *Troxel v.*

*Granville*, 530 U.S. 57, 65 (2000) (plurality op.). And the "involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed." *Z.G. v. Marion Cty. Dep't of Child Serv. (In re C.G.)*, 954 N.E.2d 910, 916 (Ind. 2011). Therefore, "the certainty of a trial court's decision to terminate a parent's parental rights to his or her child is paramount." *A.A. v. Ind. Dep't of Child Serv. (In re V.A.)*, 51 N.E.3d 1140, 1144 (Ind. 2016). And we review such a decision under a "heightened standard" requiring clear and convincing evidence that termination is appropriate. *Id*. However, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Office of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.*

[12] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. Usually, when a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).[2] However, in this case, Mother does not challenge either the findings or specific conclusions; rather, she contends that the termination

---

[2] First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id*.

order must be reversed because DCS mishandled her case to such an extent that it denied her due process of law.

[13] When the State seeks to terminate parental rights, "it must do so it in a manner that meets the requirements of due process." *M.K. v. Marion Cty. Dep't of Child Serv.* (*In re J.K.*), 30 N.E.3d 695, 699 (Ind. 2015) (quotations and citations omitted). The nature of the process due in proceedings to terminate parental rights is governed by a balancing of the "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. *Phelps v. Porter Cty. Off. of Family & Children* (*In re A.P.*), 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*.

> The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of his or her child. And the State's interest in protecting the welfare of a child is also substantial. Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

*K.M. v. Ind. Dep't of Child Serv.* (*In re S.L.*), 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.*, 954 N.E.2d at 917).

[14] In looking at the risk of error created by DCS's actions, we keep in mind that "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents

in the upbringing of their children." *J.A. v. Ind. Dep't of Child Serv.* (*In re G.P.*), 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations and citations omitted). "[T]hese two proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter." *Id.* And "[a]ny procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *In re S.L.*, 997 N.E.2d at 1120; *see also A.S. v. Ind. Dep't of Child Serv.* (*Matter of C.M.S.T.*), 111 N.E.3d 207, 213 (Ind. Ct. App. 2018) (holding that "the chaotic and unprofessional handling" of a CHINS case violated the parents' due process rights, requiring reversal of the termination order).

[15] Here, Mother's only due process claim is that DCS failed to ensure that she had an opportunity to address its concerns about her mental health. Specifically, she contends that DCS failed to make reasonable efforts toward family preservation as required under Indiana Code Section 31-34-21-5.5(b)(2)[3] because it did not provide her with necessary mental health services in a timely fashion. However, the record establishes that DCS not only offered, but required Mother to attend, mental health services from the beginning of the

---

[3] That statute provides that DCS shall make reasonable efforts to preserve and reunify families to make it possible for the child to return safely to the home as soon as possible. I.C. § 31-34-21-5.5(b)(2). However, "we observe that the CHINS provision is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *A.Z. v. Ind. Dep't of Child Serv.* (*In re H.L.*), 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) (citation omitted).

CHINS case through the date the permanency plan was changed from reunification to termination of parental rights and adoption, and it permitted her attendance beyond that point.[4]  The trial court entered a judgment of CHINS on December 21, 2015, and Mother was referred to the Samaritan Center and completed a mental health evaluation on December 23, 2015.  That evaluation recommended individual therapy for Mother, which DCS provided.  However, Samaritan Center discontinued Mother's therapy in March of 2016 due to Mother's poor attendance; Mother only attended one out of three scheduled therapy sessions in January and completed no scheduled sessions in February.

[16]   In May of 2016, DCS provided Mother with home-based individual therapy.  Mother missed two out of five therapy sessions in May and had to change to office-based therapy due to her harassment of the home-based therapist.  DCS then submitted a referral for Mother to once again obtain services at Samaritan Center, but Mother failed to attend the evaluation that was scheduled for July 20, 2016.  On November 29, 2016, DCS followed the recommendation of its clinical specialist and submitted a referral for Mother to obtain psychiatric

---

[4]  As DCS notes, although it voluntarily provided Mother with additional mental health services, it was not required to make efforts toward reunification—including providing services such as mental health services—after February 13, 2017, when the trial court changed the permanency plan to termination of parental rights and adoption.  I.C. § 31-34-21-5.8; *see also L.W. v. Dep't of Child Serv. of Vanderburgh Cty. (In re A.D.W.)*, 907 N.E.2d 533, 538 (Ind. Ct. App. 2008) (noting the statute "provides that DCS is not required to provide services for reunification if it is contrary to the permanency plan adopted by the trial court," such as where the permanency plan is changed from reunification to termination of parental rights).  Thus, to the extent Mother challenges the failure to provide mental health services after February of 2017, her arguments are not well taken.

testing. Mother scheduled the appointment for that testing for a date in January of 2017. However, in December of 2016, Mother "changed her mind and stated she did not really want to do the testing. [Mother] stated, 'I will if I have to, but if I am not court ordered, I am not going to do it.'" Ex. at 54. Mother did obtain the psychological evaluation on January 9, 2017, and the evaluation recommended "more intensive, ongoing mental health treatment as a pre-requisite for having increased or unsupervised contact with her child." *Id.* at 157. However, by that time Child had been in out-of-home placement for close to fifteen of the most recent twenty-two months; therefore, on January 5, DCS filed a motion recommending modification of the permanency plan to termination of parental rights, which the trial court granted on February 13.

[17] Thus, DCS consistently offered Mother mental health services throughout the entire CHINS proceeding; it is Mother who failed to consistently avail herself of those services. DCS made reasonable efforts toward family preservation as required under Indiana Code Section 31-34-21-5.5, and the termination of Mother's parental rights did not violate her due process rights.

[18] Affirmed.

Riley, J., and Pyle, J., concur.