

FILED

Oct 31 2019, 8:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Katharine Vanost Jones
Vanderburgh County Public
Defenders Office
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Termination of the Parent-Child Relationship of: | October 31, 2019 |
| T.W. (Minor Child) | Court of Appeals Case No. 19A-JT-670 |
| and | Appeal from the Vanderburgh Superior Court |
| T.K. (Father), | |
| *Appellant-Respondent,* | The Honorable Brett J. Niemeier, Judge |
| v. | Trial Court Cause No. 82D04-1808-JT-1509 |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner* | |

**Baker, Judge.**

[1] T.K. (Father) appeals the trial court's order terminating his parent-child relationship with his child, T.W. (Child). Finding that the Department of Child Services (DCS) did not make reasonable efforts to reunify Father with Child, thereby violating Father's due process rights, we reverse and remand.

## Facts

[2] Child was born on March 6, 2017, to Father and K.W. (Mother). At the time of Child's birth, Father was incarcerated in Kentucky and was unable to establish paternity. Child was removed from Mother's care and custody on March 7, 2017, because Mother had substance abuse issues, had unstable housing, and was failing to comply with a Child In Need of Services (CHINS) case involving Child's older sibling. On March 9, 2017, DCS filed a petition alleging that Child was a CHINS, and on April 5, 2017, the trial court granted the petition as to Father.[1] On the same day, the trial court held a dispositional hearing related to Father, ordering him to contact DCS upon his transfer or release from custody.

[3] Before Child was born, Father, knowing that Child was likely to be a CHINS because of Mother's ongoing substance abuse issues, contacted DCS, acknowledged paternity, and requested assistance to be an active participant in the case. After Child was born, Father spoke with a Family Case Manager

---

[1] The trial court held a factfinding hearing with regard to Mother on April 18, 2017, and ultimately let stand its finding that Child was a CHINS. Mother is not a party to this appeal.

(FCM) and requested that Child be placed with paternal grandmother, who lives in Kentucky. DCS began the process to place a ward out of state, but in the meantime, Child remained in foster care.[2]

[4] On March 23, 2018, Father was released from incarceration and placed on probation for four and one-half years. He called FCM Brandon Meredith on March 29, 2018. During that phone call, Father provided FCM Meredith with the address where he was staying at the time, but told the FCM that he was not staying there permanently and was instead "couch surfin'." Tr. Vol. II p. 20. FCM Meredith inferred that Father was homeless.

[5] Father met with FCM Meredith at DCS on April 6, 2018. At that meeting, FCM Meredith told Father he needed to establish paternity and obtain a substance abuse evaluation. Father indicated that as he was recently released from incarceration, he needed help to understand what to do and how to comply with services. FCM Meredith agreed to provide parent aide services to assist Father in finding employment and housing and to set up visitation. FCM Meredith never made a referral for a parent aide.

[6] With respect to paternity, Father went to the Vanderburgh County Prosecutor's Office and obtained the necessary paperwork. An employee in that office showed Father which sections of the forms he needed to fill out and told him to

---

[2] The record does not reveal whether Father's mother was ever approved as a caregiver. In any event, Child has never been placed with her.

deliver the documents to the FCM, who would fill out the rest of the information (about Child, Child's placement, and Mother) and return it to the Prosecutor's Office. The employee told Father that the FCM, rather than Father, had to return it because there would be confidential information on the form. The week of April 10, 2018, Father completed his sections of the forms and took the packet to DCS.[3] FCM Meredith evidently filled out the forms and then called Father and told him to retrieve the packet. Father, under the impression that DCS had to return the documents to the Prosecutor's Office, did not retrieve the paperwork. After two weeks passed with Father not retrieving the documents, FCM Meredith put them in his file. FCM Meredith was asked whether, at that point, he decided "that the child would be better off with someone else," and he responded, "Yes." *Id.* at 82. He stated that it was Father's responsibility to contact him and that Father "did not inform me that I was supposed to return it to the Prosecutor's Office." *Id.* at 84.

[7] FCM Meredith made a referral for drug screens. Though he had a current and active phone number for Father, he did not call Father with the information, instead mailing it to the address Father had provided in their initial phone call. As Father was no longer staying there, he did not receive the paperwork.

[8] FCM Meredith initially made a referral for visitation at an agency. Father arrived for the first visit thirty minutes early. He had bought a new outfit for

---

[3] At some point as part of this process, Father provided a DNA sample, further evidencing his willingness to establish paternity. Tr. Vol. II p. 25.

himself and brought snacks and a Happy Meal for Child. Father checked in and was told to wait. He waited until twenty minutes after the time the visit was scheduled and learned at that point that FCM Meredith had cancelled the visit two days earlier. FCM Meredith explained his decision to cancel as follows:

> . . . I did state that I would start visitation. I did put a referral in because that's just usually how we start cases, or start with when a parent's released. But then after thinking about it, I decided to cancel that referral because [Child] had never met [Father]. And I felt [that] if we went ahead and started a visit and started forming that bond and then if things didn't go well, . . . and he just disappeared, then that would have had psychological effects on [Child]. So I did call [the agency] and cancel the visit . . . .

*Id.* at 71-72.

[9] Father and FCM Meredith did not have any contact from mid-April 2018 to August 31, 2018, when Father was arrested for violating the terms of his probation by failing to report to his probation officer. At that time, Father was placed in a Vanderburgh County work release facility. During the period with no contact between Father and DCS, FCM Meredith left voicemails for Father, but Father did not return the calls.

[10] Father has a lengthy criminal history and has been incarcerated for most of the last fifteen to sixteen years for various offenses, the majority of which are drug related. His only stable housing as an adult was from 2007 and 2008 and then

from May to December 2012. Because of his many incarcerations, he has a limited work history, and his last regular employment occurred in 2015-2016.

[11] On August 14, 2018, two weeks before Father's placement in work release, DCS had filed a petition to terminate his parental rights.[4] The termination hearing took place on January 3, 2019. At that time, Father was employed with a construction company and had ten months left to serve on work release. He had completed a substance abuse evaluation and was attending substance abuse counseling. He did not have a plan for housing upon his release, but he did have a plan for employment:

> I've got an associate's degree in welding technology. . . . I haven't been able to do much with it based on lack of job experience. So January 24th I start back to Ivy Tech and I'm takin' welding courses again 'cause I feel like I don't wanna waste that two years that I've already used and I'm gonna refresh up on some pipe welding classes and some TIG and things like that. I had talked to the people in . . . the admissions and they . . . agreed that it would be a good idea that if I was interested in getting in the unions here that they train and do some of their journeymen through the Ivy Tech facility. So I could definitely make contacts through there. 'Cause I really wanna be a pipe fitter.

*Id.* at 40-41. On February 20, 2019, the trial court granted DCS's petition to terminate the parent-child relationship. Father now appeals.

---

[4] Mother had already signed a document voluntarily terminating her parental rights.

# Discussion and Decision

## I. Standard of Review

[12] Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[13] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A)  that one (1) of the following is true:
>
> > (i)  The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## II. Termination

The "involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children." *In re I.A.*, 934 N.E.2d 1127, 1136 (Ind. 2010). Therefore, termination "remains an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (quoting *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006)). Indeed, our Supreme Court has reversed a termination order where it was unable to determine that all reasonable efforts were employed to unite a parent and child. *I.A.*, 934 N.E.2d at 1136.

As a matter of statutory elements, it has been established that DCS is not required to provide parents with services prior to seeking termination of the parent-child relationship. *E.g.*, *In re B.H.*, 44 N.E.3d 745, 752 n.3 (Ind. Ct. App. 2015). However, parents facing termination proceedings are afforded due process protections. Here, Father did not raise a due process argument to the trial court, nor does he make one on appeal. But "we have discretion to address such [due process] claims, especially when they involve constitutional rights, the violation of which would be fundamental error." *In re D.H.*, 119 N.E.3d

578, 586 (Ind. Ct. App. 2019), *aff'd in relevant part on reh'g*, 122 N.E.3d 832 (Ind. Ct. App. 2019), *trans. denied*; *S.B. v. Morgan Cty. Dep't of Pub. Welfare*, 616 N.E.2d 406, 407 (Ind. Ct. App. 1993) (holding that the "constitutionally protected right of parents to establish a home and raise their children mandates that the failure of a trial court to require compliance with any condition precedent to the termination of this right constitutes fundamental error which this court must address sua sponte") (internal citations omitted). Here, Father's substantive due process right to raise his child and his procedural due process right to fair proceedings are at issue; therefore, we elect, sua sponte, to consider whether those rights were protected in this case.

[16]    When the State seeks to terminate parental rights, it must do so in a manner that meets the requirements of due process. *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014). The nature of the process due in any proceeding is governed by a balance of three factors: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." *D.H.*, 119 N.E.3d at 588. This Court has described those interests in the context of termination proceedings as follows:

> The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of his or her child. And the State's interest in protecting the welfare of a child is also substantial. Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

*K.M. v. Ind. Dept. of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (internal citations omitted).

[17] We find the *D.H.* Court's discussion of due process in the context of termination proceedings particularly relevant and helpful in this case:

> In looking at the risk of error created by DCS's actions, we keep in mind that "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *J.A. v. Ind. Dep't of Child Serv.* (*In re G.P.*), 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations and citations omitted). "[T]hese two proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter." *Id.* And "[a]ny procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *In re S.L.*, 997 N.E.2d at 1120; *see also A.S. v. Ind. Dep't of Child Serv.* (*Matter of C.M.S.T.*), 111 N.E.3d 207, 213 (Ind. Ct. App. 2018) (holding that "the chaotic and unprofessional handling" of a CHINS case violated the parents' due process rights, requiring reversal of the termination order).
>
> For example, in *Matter of C.M.S.T.*, we held that procedural irregularities in the CHINS case—such as multiple FCMs, inappropriate behavior by FCMs, and apparent bias of FCMs—contributed to the parents' non-compliance such that termination of their parental rights amounted to a denial of their due process rights. 111 N.E.3d at 213, 14. *See also, In re A.P.*, at 1117 (finding parents' due process rights were violated in a termination action where DCS made multiple procedural errors, such as failing to provide parents with copies of case plans and filing CHINS and termination petitions that did not meet statutory requirements); *cf. N.P. v. Ind. Dep't of Child Serv.* (*In re R.P.*), 949

N.E.2d 395, 403 (Ind. Ct. App. 2011) (citing *J.I. v. Vanderburgh Cty. Off. of Family & Children (In re A.I.)*, 825 N.E.2d 798, 816 (Ind. Ct. App. 2005) (noting that one procedural deficiency alone may not result in a due process violation), *trans. denied*).

We must also consider the general proposition that, "if the State imparts a due process right, then it must give that right." *In re C.G.*, 954 N.E.2d at 918 (citing *In re A.P.*, 734 N.E.2d at 1112). . . . And DCS's own policy manual, of which we take judicial notice, *see* Evid. R. 201(a), provides unequivocal directions to DCS regarding the provision of services. First, it states that DCS "will provide family services to all children and families with an open case . . . ." Indiana Dep't of Child Serv. Child Welfare Policy Manual ("the Manual"), Ch. 5, Sec. 10, [https://www.in.gov/dcs/files/5.10%20Family%20Services.pdf (last visited Oct. 21, 2019)]. Next, Chapter 5, Section 10 of the Manual states:

> DCS *will make appropriate service referrals* on behalf of the . . . family . . . DCS *will regularly communicate with all service providers throughout the life of the case* to discuss the family's progress and any concerns. . . .

> DCS *will reassess* the strengths and *needs of the child and family throughout the life of the case and will adjust services*, if necessary, to meet identified needs. DCS will continue to offer services to the . . . family *regardless of participation*[, until the court . . . dismisses the [CHINS] case, or rules that reasonable efforts to reunify the family are not required.]

> \*\*\*

> The FCM will: . . . (3) Collaborate with the family and the CFT [Child and Family Team] to *identify needed services* . . .

[7] Monitor the family's progress by: (a) *maintaining contact with services providers to assess the family's level of participation* in services . . . [10] Discuss the family's participation and progress regarding case goals and results of any new assessments . . . and *adjust services and/or service levels as necessary* . . . [11] *Document* in [the case management system] the family's progress, reasons for service type or intensity changes, and if applicable, reasons why services were not offered or were stopped.

The FCM will: . . . [4] *Follow up with service providers* to evaluate the family's response to the change and/or removal of services.

*Id.* (emphasis added) (emphases original).[5]

*D.H.*, 119 N.E.3d at 588-89. In the end, the *D.H.* court concluded that "[t]he significant procedural irregularities in the CHINS case created a risk of the erroneous filing of a petition to terminate Mother's parental rights to Children, in violation of Mother's due process rights." *Id.* at 591. The court reversed the termination order and remanded for reinstatement of the CHINS cases, reexamination of the requirements for Mother's reunification with her children, and entry of a revised dispositional order outlining the services she needed to complete to reunify with the children.

---

[5] The DCS Policy quoted in *D.H.* has been amended since *D.H.* was published; we have incorporated those changes in the bracketed portions of the quotation.

[18]     In addition to due process protections, we note that the termination statute requires that DCS allege one of three things: (1) the child has been removed from the parent for at least six months under the dispositional decree; (2) a finding has been entered that no reasonable efforts for family preservation or reunification are required; or (3) the child has been removed from the parent for at least fifteen of the most recent twenty-two months. I.C. § 31-35-2-4(b)(2)(A). The second prong of this statute is important because it directly relates the termination petition to the general requirement that DCS "make reasonable efforts to preserve and reunify families[.]" Ind. Code § 31-34-21-5.5(b). That requirement applies in all CHINS cases except for those that fall under Indiana Code section 31-34-21-5.6(b), which describes the limited circumstances in which no reasonable efforts are required. Unless that statutory exception applies, DCS is obligated to make reasonable efforts to preserve and reunify families in CHINS proceedings. By incorporating the no reasonable efforts statute into the termination statute, the General Assembly has necessarily incorporated that same DCS obligation (as well as its exception) into termination proceedings.

[19]     All of the above lead us to one conclusion: for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit in the CHINS case (unless the no reasonable efforts exception applies). What constitutes "reasonable efforts" will vary by case, and as noted above, it does not necessarily always mean that services must be provided to the parents. In the

end, we think that it does not ask too much of DCS to behave reasonably under such grave circumstances.

[20] Turning to this case, Father's interest in being involved predates Child's birth, when he first reached out to DCS. Father then contacted FCM Meredith within a week of his release from incarceration, and they met shortly thereafter. In the early days of their interactions, there are four relevant DCS efforts to consider: Father's establishment of paternity; drug screens; visits; and a referral for a parent aide.

### Establishment of Paternity

[21] First, we will consider DCS's requirement that Father establish paternity. Nothing in the record indicates that he was unwilling or reluctant to do so; indeed, the record shows that he acknowledged paternity to DCS before Child was even born.

[22] When Father went to the Prosecutor's Office to obtain the necessary paperwork, an employee showed Father which sections of the forms he needed to fill out and told him to deliver the documents to the FCM, who would fill out the rest of the information (about Child, Child's placement, and Mother) and return it to the Prosecutor's Office. The employee told Father that the FCM, rather than Father, had to return it because there would be confidential information on the form. Father completed his sections of the forms and took the packet to DCS.

[23] FCM Meredith evidently filled out the forms and then called Father and told him to retrieve the packet.[6] The paternity paperwork sat at the DCS front counter for two weeks, at which point FCM Meredith placed it in Father's file and took no further action on the matter. At the termination hearing, FCM Meredith complained that Father "did not inform me that I was supposed to return [the documents] to the Prosecutor's Office." Tr. Vol. II p. 84.

[24] It is clear that Father was caught between a proverbial rock and hard place, as he received contradictory orders from two different government agencies, receiving no help from his FCM to sort out the situation. At the termination hearing, Father quite ably described his frustration and confusion:

> . . . [B]oth of the times that I've talked to the . . . lady that works in the Prosecutor's Office, she has told me both times that that is not my responsibility. She told me that I'm not supposed to even—I'm only supposed to fill in the parts that are highlighted and I'm supposed to leave it at the DCS. And if I did agree [to retrieve the paperwork from DCS and return it to the prosecutor's office], which I did, I felt more pressure from that not knowin' how to actually answer the question. Because I feel like there's so many questions that I don't know the answers to. . . . Like when one person's tellin' me somethin' and another person's tellin' me somethin' different, I don't really know how— 'cause if [DCS] lies, it's like a dog chasin' [its] tail, because there's nobody gives you no answer. Somebody tells you to do somethin' different every way you go, then whenever you try to

---

[6] The record is slightly unclear, but it appears that at some point, Father and FCM Meredith talked about the paternity paperwork. Father, feeling confused and wanting to be agreeable, told the FCM that he would return the paperwork to the Prosecutor's Office, though he never did so because of the advice he got from the employee at the Prosecutor's Office.

actually get to the answer, you've already done went down a mile of road to try to figure it out, and you still haven't got an answer.

*Id.* at 31.

[25] Father did exactly what he was supposed to do to establish paternity. He went to the prosecutor's office, retrieved the appropriate paperwork and got advice about how to fill it out, filled it out, and took it to DCS. FCM Meredith filled out DCS's portion of the paperwork, left it for Father to pick up, and took no further action on it. He offered no assistance or guidance to Father.

[26] Perhaps most damning of all, it was at this extraordinarily early juncture in Father's post-incarceration life (and in his involvement with the CHINS case) when FCM Meredith decided that Child would be better off with someone else. Rather than offering assistance to Father, FCM Meredith wrote him off, and made only limited efforts at reunification from this point forward.

### *Drug Screens*

[27] Next, we note that FCM Meredith did make a referral for drug screens for Father. When he first met with Father and heard Father describe his living situation, FCM Meredith inferred that Father was "basically homeless[.]" Tr. *Id.* at 67. Notwithstanding this knowledge, and notwithstanding the fact that the FCM had an active and current phone number for Father, FCM Meredith did not call Father to tell him about the drug screens. Instead, he merely mailed that information to the address provided by Father at that initial meeting. Because Father was not actually living at that address, he never

received that information and never provided a drug screen. Given that FCM Meredith was aware that Father was homeless, we believe that it was unreasonable that the FCM did not call Father to inform him about the drug screens. With this course of action, the FCM was setting Father up to fail.

## Visits

[28] Perhaps one of the most heartbreaking parts of the CHINS case was Father's experience regarding visitation with Child. FCM Meredith made a referral for agency supervised visits and a first visit was scheduled. Things did not go as planned.

> I went to the visit. I was there about a half hour early. And I had bought like—I was nervous. About as nervous as I am right now. I mean, I bought an outfit. I bought clothes, snacks, a Happy Meal. And I sat there and I waited for the people at [the agency]. And . . . I went to the window and . . . I asked if I was supposed to have a visit. I mean, was I supposed to check in for my visit and they said "No, you just sit tight. Hang out. It's still early." . . . So I sat on it until about—probably about twenty minutes after when [Child] was supposed to be there. So finally I went and I said, "Could somebody please give me some sort of answer on what's goin' on here, 'cause I don't know." So then the guy that came to the window said, "Let me check on what's goin' on here." And he went and checked in the computer. He said that a couple days prior to this visit that I was supposed to have, he said that somebody had removed my case from their computer, that I was no longer to have services through [the agency].

*Id.* at 25-26.

[29] In other words, although FCM Meredith initially told Father he would have visits, going so far as to make a referral for the visits and allow a visit to be scheduled, he then changed his mind. FCM Meredith explained his change of mind as follows:

> . . . I did state that I would start visitation. I did put a referral in because that's just usually how we start cases, or start with when a parent's released. But then after thinking about it, I decided to cancel that referral because [Child] had never met [Father]. And I felt [that] if we went ahead and started a visit and started forming that bond and then if things didn't go well, . . . and he just disappeared, then that would have had psychological effects on [Child]. So I did call [the agency] and cancel the visit . . . .

*Id.* at 71-72. Here, again, we have the FCM deciding from the outset that Child would be better off in foster care and that Father did not deserve a chance to be a parent. This course of events set Father up to fail. If he was unable to visit Child, then he was unable to bond with Child, which ultimately worked against him during the termination proceedings. We do not find FCM Meredith's efforts in this regard to be reasonable.

## *Parent Aide*

[30] Finally, at the first meeting with FCM Meredith, Father asked for help with his transition to life following his release from incarceration and with compliance with services. FCM Meredith agreed that in this situation, a parent aide would have been helpful for Father, and said that he would make a referral for one. While FCM Meredith made referrals for drug screens (which he did not call Father about) and visits (which he changed his mind about and cancelled), he

never made a referral for a parent aide. Had Father had a parent aide in place, it is very likely that he would have gotten the help needed to establish paternity, since the FCM was unable or unwilling to assist him with that process.

[31] It is true that Father lost contact with DCS and with his probation officer for several months before he was re-arrested. And yes, this must be taken into consideration. But what must also be taken into consideration are the circumstances of Father's life at that time. He had just been released from what basically amounted to sixteen years in prison. As he explained,

> the thing that's hard for people to understand for me is, like the first few months are real important for me because it's hard to try to micro-manage your life. Whenever somebody pays your water bill, your electric bill, they give you the sheets you sleep on, they tell you where your job's at, they tell you all these different things, and it's been happenin' for so long that whenever you come into the real world you're supposed to seek all these things on your own, it's like a vacuum.
>
> ***
>
> [I]t's been the single hardest thing I've ever done in my life.

Tr. Vol. II p. 34-35.

[32] Father freely admitted that he lost communication with everyone involved in the case, explaining that his challenges got the better of him:

> It was hard. I don't know if it's just me internalizin' things, but I feel like things are abrasive, always abrasive towards me. Things snowball. So then like I didn't [meet with his probation officer].

> And then maybe I didn't make it to go pick up the paperwork or I agreed to do somethin' that I knew I wasn't gonna—you know what I'm sayin'? So then those things start to add up and then I started feelin' ashamed of myself. And then I start dealin' with stuff like depression.

> ***

> I was depressed. 'Cause I'm a man of my word. I truly, genuinely believe that if [I] look in your eyes and I make an agreement with you that I'm supposed to stand on it. So then whenever I can't then it starts makin' me look to the side. And those things, whenever they start to pile up, I feel like—even if it's only a couple things to a couple different people, then I feel like what is my answer, how do I get away from that. Because I've already got into it.

*Id.* at 36, 42.

[33] Father was released from sixteen years of incarceration. He had no job, no housing, and no real supports. It should have been no surprise to FCM Meredith that Father would, at times, flounder. Father should have been given *more* assistance in this situation—especially since he explicitly asked for it. Instead, FCM Meredith decided, almost from the outset, that Child would be better off in foster care, making no genuine efforts to provide Father with the support and services he so desperately needed.

[34] When stepping back and looking at this situation in its totality, we can only conclude that DCS did not make reasonable efforts to reunify Father with Child. Likewise, we can only conclude that the insufficient process employed

in the CHINS case created a risk of the erroneous filing of a petition to terminate Father's parental rights to Child, in violation of Father's due process rights.

[35] We acknowledge the worthy desire to provide Child with permanency. But we must also consider the sacrosanct legal relationship between parent and child, the severing of which is one of the most extreme actions taken in our legal system. In this case, DCS wholly failed to make reasonable efforts to preserve that relationship. Father is entitled to try to become a safe and appropriate parent to Child, and DCS is required to help him do so. Therefore, we reverse and remand.

[36] The judgment of the trial court is reversed and remanded with instructions to reopen the CHINS case, reexamine the requirements for Father's reunification with Child, and enter a new dispositional order outlining the services Father must comply with to effect reunification.

Kirsch, J., and Crone, J., concur.