## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 22 2020, 10:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of: I.W. (Minor Child) and R.W. (Father) | July 22, 2020 |
| | Court of Appeals Case No. 20A-JT-92 |
| R.W. (Father), | |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court |
| v. | The Honorable Mark A. Jones, Judge |
| | The Honorable Ryan K. Gardener, Magistrate |
| Indiana Department of Child Services, | |
| *Appellee-Petitioner* | Trial Court Cause No. 49D15-1901-JT-86 |

**Vaidik, Judge.**

# Case Summary

[1] R.W. ("Father") appeals the termination of his parental rights to his son, I.W. ("Child"). We affirm.

# Facts and Procedural History

[2] Father and E.W. ("Mother") are the biological parents of Child, who was born in 2010. Mother signed a consent to Child's adoption and does not participate in this appeal. *See* Appellant's App. Vol. II p. 130. We therefore limit our narrative to the facts relevant to Father.

[3] In March 2017, the Department of Child Services (DCS) received a report alleging that Child was being neglected. Family Case Manager (FCM) Deja Thomas investigated and spoke with Father over the phone. Father said that he had a house in Kokomo but claimed that he and Child could not move in yet. Father provided an address for this house; however, when FCM Thomas looked up the address, she discovered that it did not exist. FCM Thomas spoke to Father by phone a second time, and this time Father claimed that he had a house in Plainfield but did not give FCM Thomas its address when she asked for it. At some point, FCM Thomas learned that Father was being held at Eskenazi Hospital and went to meet him in person. When FCM Thomas arrived, Father told her that he had been diagnosed with bipolar disorder and was being held for further evaluation. Father also said that "his family was out to steal his money," that he was not crazy, and that he did not have mental-

health issues. *Id.* at 22. Regarding Child, Father told FCM Thomas that he had left Child with Father's sister ("Aunt"). FCM Thomas contacted Aunt and confirmed that Child was in her care.

[4] On March 27, DCS filed a petition alleging that Child was a Child in Need of Services (CHINS). Later that day, an initial/detention hearing was held. Father did not appear, so the trial court continued the initial hearing. Ex. 5. As for detention, the court ordered that Child be removed from Father's care and placed in relative care with Aunt. On April 7, the court resumed the initial hearing. This time, Father appeared and denied the allegations in the CHINS petition. Father also told the trial court that he planned to hire private counsel. *See* Ex. 6. Thereafter, on April 21, private attorney Kent Lamb appeared on Father's behalf for a pretrial hearing.

[5] After various continuances, the trial court held another pretrial hearing in September 2017. Father did not appear for this hearing; however, Attorney Lamb appeared on his behalf. At this hearing, Attorney Lamb told the trial court that "he may withdraw his appearance at a later date." Ex. 11. Attorney Lamb said that "Father has not been maintaining contact, [that he] has been unable to speak with [Father] to determine his position regarding adjudication and that he's uncertain where their attorney-client relationship stands at the time of this hearing." *Id.* At the end of the hearing, the court set the CHINS fact-finding hearing for October 20, 2017.

[6] On October 17, 2017, three days before the CHINS fact-finding hearing was scheduled to begin, Attorney Lamb moved to withdraw his appearance. In his motion, Attorney Lamb indicated that he was retained by Father's mother to represent Father in the CHINS case, that since the initial hearing he has had "a contentious, and often volatile relationship" with Father, that there has been "absolutely no contact between [he] and [Father] other than contact occurring at the courthouse on days that this matter was set for hearing," and that he could not establish a working relationship with Father and cannot continue to represent him without the "possibility of open hostility." Ex. 14. Attorney Lamb also stated that he had notified Father's mother (the one who retained him) about moving to withdraw. Attached to Attorney Lamb's motion to withdraw was a letter that he had sent Father on May 25, 2017. In this letter, Attorney Lamb stated that Father had not spoken to him since the CHINS initial hearing, requested that Father let him know whether he wanted Attorney Lamb to continue to represent him in the CHINS matter, and indicated that if he did not hear from Father within ten days, he would move to withdraw as Father's counsel. *See id.* On October 18, the trial court granted Attorney Lamb's motion to withdraw.

[7] Two days later, the CHINS fact-finding hearing began. Father did not appear, and following the hearing, the trial court adjudicated Child a CHINS. That same day, the court conducted a dispositional hearing and ordered Father to participate in services, including completing a mental-health assessment, home-

based therapy, "father's engagement," and random drug screens. Appellant's App. Vol. II p. 21.

[8] In January 2018, the trial court held a review hearing in the CHINS case. Father appeared by phone. He alleged that he had completed two mental-health evaluations and requested the appointment of counsel. The trial court found that Father was indigent and appointed a public defender, Merryn Gluys, to represent him. Regarding his mental-health evaluations, the trial court ordered Father to complete the mental-health evaluation referred by DCS and ordered DCS to ensure that the appropriate referral was in place. *See* Ex. 19.

[9] For the next eleven months, Attorney Gluys represented Father in the CHINS case and often appeared on his behalf, even though Father himself did not. For instance, the trial court held a CHINS review hearing in August 2018. Father did not appear, but Attorney Gluys appeared on his behalf and told the court that she had not had contact with Father since she was appointed to represent him. *See* Ex. 23. In December 2018, the trial court held a CHINS permanency hearing. Once again, Father did not appear, but Attorney Gluys did so on his behalf. Following the hearing, the trial court changed Child's permanency plan from reunification to adoption, finding that Father had not been participating in services and that DCS and Child's guardian ad litem (GAL) both recommended that Child's permanency plan be changed to adoption. *See* Ex. 25.

[10] In January 2019, DCS filed a petition to terminate Father's parental rights. A fact-finding hearing was held in December 2019. Father failed to appear, but

Attorney Gluys appeared on his behalf. Home-based therapist Sandra Caesar testified that she called Father on October 10, 2019, and scheduled his intake appointment for October 14; however, Father "did not show." Tr. p. 52. Caesar said that after Father missed his first appointment, she contacted him, and he said that his car broke down. She rescheduled his intake appointment for October 17. Caesar said that on that day Father "was a no show again." *Id.* at 53. Caesar testified that, once again, she contacted Father and rescheduled his intake appointment for October 21. Caesar said that this time she sent Father a text message before his appointment, reminding him of the date, and that Father replied that he would attend; however, once again Father "no showed." *Id.* at 54. Caesar said that after Father failed to attend his third scheduled intake appointment, she "didn't make any more efforts" and closed out his referral unsuccessfully. *Id.*

[11] Philip Sowders, one of Father's father-engagement service providers, testified that he started working with Father in June 2018 and met with Father "approximately four times." *Id.* at 27. Sowders stated that when he met Father, "he was homeless, so one of the things [they] talked about was trying to secure a place he could live." *Id.* at 28. Regarding employment, Sowders said that Father told him "that he had a very large inheritance" and that he was doing "some construction work." *Id.* at 29. Sowders stated, however, that he did not "ever see any indication of [Father's] lifestyle that he had a large inheritance that he could access." *Id.* Sowders testified that he also observed things about Father that made him think that Father needed mental-health care. Sowders

said that, for example, Father "was able to identify who he was [but] he could not always identify where he lived, in other words, was this Indianapolis," and that Father "could not at times tell [Sowders] what year it was or he could not tell [Sowders] who the president of the United States was." *Id.* at 31. Sowders stated that his last contact with Father was on July 13, 2018, that his services were closed "due to non-compliance," and that Father was unsuccessfully discharged from his services. *Id.* at 34.

[12] Floyd Carson testified that in early 2018 he received a referral to provide Father with supervised visits and home-based case work. *See id.* at 37. Carson said he worked with Father for "[m]aybe like a week" and that his referral was closed due to non-compliance. *Id.* When asked why he only worked with Father for a week, Carson stated that after he first contacted Father, "he was a no show, [Carson] went to [Father's mother's] house [and] he was just absent after that visit. He was just . . . non-existent at that point." *Id.* at 38. Regarding the attempts Carson made after Father's absence, Carson testified that he made "several phone calls" and "several pop-ups" at Father's mother's house. *Id.* Carson said that then, in November 2019, he received a second referral to work with Father. Carson stated that this second referral was still open and that he was referred to provide Father with father engagement and supervised visits. Carson said that he supervised one visit between Father and Child that "went well" until Father made "delusional statements" that "he had 20, 30 houses, and 56 million dollars." *Id.* at 39-40. Carson also testified that he observed Father's lifestyle and saw that he was staying in a camper in the driveway of his

mother's house. Carson said that when he looked inside the camper, it "was full of clutter, no heat, no water, odor was unbearable." *Id.* at 40. Carson stated that the day before the fact-finding hearing, he visited the camper (to remind Father about the termination hearing) and saw that it was still in the same cluttered condition. *See id.* at 44-45. Carson testified that based on his observations, he did not recommend that Child be placed with Father unsupervised.

[13] FCM Phyllis Clemons testified she had been Child's case manager since the beginning of the CHINS case. FCM Clemons said that she referred Father for home-based therapy "approximately three to four times" because "providers would attempt to make contact [with Father] and if there was no contact or participation, they would close out." *Id.* at 60. FCM Clemons also stated that in addition to Sowders and Carson, she made "at least two more" referrals for father engagement, but received no notice that Father had successfully completed father engagement. *Id.* at 62. FCM Clemons also said that she made "[a]pproximately three to four" referrals for Father to complete a mental-health assessment, but never received notice that he did so with any DCS-referred providers. *Id.* at 63. As for the four mental-health assessments that Father claimed he had taken on his own, FCM Clemons said that she had received none of those assessments. *See id.* at 66. FCM Clemons testified that she also made referrals for Father to participate in random drug screens because of allegations of substance abuse. FCM Clemons said that during the CHINS case (over two years) she had received one drug screen for Father in November 2018. *See id.* at 64. FCM Clemons explained that besides Father's failure to

engage in random drug screens, other evidence made her believe that Father still had a substance-abuse problem. *See id.* at 76. FCM Clemons said that, for example, while the CHINS case was pending, Father was convicted of Level 6 felony possession of methamphetamine in October 2018, and there was a pending charge against Father for Level 6 felony possession of methamphetamine (Father later pled guilty in that case).

[14] FCM Clemons also testified that during the CHINS case, Father made concerning statements to her, such as "[t]hat he worked for the FBI," that "he made over . . . a million dollars," and that "he has several businesses." *Id.* at 81. FCM Clemons said these statements were concerning because Father "was homeless at times and different periods." *Id.* FCM Clemons said that she believes it is in Child's best interests for Father's parental rights to be terminated. *Id.* at 79. FCM Clemons explained that she believes Child "deserves permanency" and that "he deserves that safe, stable home environment that's totally committed to him and meeting all of his needs." *Id.* at 80. FCM Clemons testified that DCS's plan was adoption and that Aunt was "looking forward to adopting [Child]." *Id.* at 73. Child's GAL, Jessica Adams, testified that she observed that Child is bonded to his Aunt and her family, that he "refers to aunt's husband as dad," and that Child gets "along well with the aunt's biological children." *Id.* at 91. GAL Adams said that she believes it is in Child's best interests to terminate Father's parental rights. *See id.* at 93. GAL Adams stated that she does not believe Father should be given additional time

to complete services and work towards reunification with Child. GAL Adams explained:

> [Father] has been given several opportunities, several referrals have been made, we've attempted to meet with him for team meetings, and he would say he was coming and then, when he wouldn't show up the case manager would reach out to him, and he always said it was typically always the same exact stories that he had a issue with transportation, he didn't have a ride, a few times he said his car was impounded, but there was always a reason as to why he couldn't attend at minimum a CFTM, a Child and Family Team Meeting.

*Id.* at 94. In December 2019, the trial court issued its order terminating Father's parental rights.

[15] Father now appeals.

# Discussion and Decision

## I. Due Process

[16] Father contends that "[a]llowing counsel to withdraw two days before the CHINS hearing, and without adequate notice to [Father], was a gross abuse of [Father's] right to counsel and his due process right to a fair hearing" and is "a *per se* grounds for reversal." Appellant's Br. p. 9.

[17] First, it does not escape us that Father did not raise a due-process claim before the trial court. Because Father failed to make his due-process claim in the trial court, during the subsequent CHINS proceedings, or in the termination

proceedings, it is waived. *See Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) ("It is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal.").

[18] Waiver notwithstanding, Father has not convinced us that lack of counsel at the combined CHINS fact-finding and dispositional hearing requires reversal of the termination order. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014). Determining what process is due involves balancing three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting use of the challenged procedure. *Id.* at 1165-66. Here, both the private and government interests are substantial. Therefore, our task is to determine the risk of error created when Father did not have counsel during the CHINS fact-finding and dispositional hearings.

[19] In determining the risk of error created by the State's chosen procedure, we keep in mind that due-process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children. *Id.* at 1165. "[T]hese two proceedings—CHINS and TPR—are deeply and obviously intertwined to the extent that an error in the former may flow into and infect that latter." *Id.* However, where lack of counsel results in child being adjudicated a CHINS,

there is "less of a collateral impact because the processes are still distinct and an error may be corrected in a TPR proceeding—before the harm becomes permanent." *Id.* at 1168 (citing *In re E.P.*, 653 N.E.2d 1026, 1032 (Ind. Ct. App. 1995) ("However, unlike a termination proceeding . . . where an erroneous result obviously would be disastrous, an erroneous CHINS adjudication has a far less disastrous impact on the parent-child relationship.")).

[20] Here, there are several reasons the risk of error created by allowing Attorney Lamb to withdraw two days before the combined CHINS fact-finding and dispositional hearing is minimal. First, the risk is low because Father was appointed an attorney shortly after the CHINS hearing and had counsel for the next eleven months of CHINS proceedings. In other words, Father was appointed counsel in time to correct any error in the CHINS proceeding, before the harm became permanent. *See id.* Second, Father had the opportunity to demonstrate his parental fitness by engaging in services but chose not to. He also failed to appear for most of the CHINS review and permanency hearings and did not even appear for the final termination hearing. Moreover, Father does not say how not having counsel during the CHINS hearing prejudiced him in the termination proceeding. He does not tell us what would have been different had he had counsel at his combined CHINS fact-finding and dispositional hearing at which he did not even appear. For all of these reasons, Father has failed to show that not having counsel during the combined CHINS fact-finding and dispositional hearing created such a risk of error that the termination order requires reversal. *Cf. In re D.H.,* 119 N.E.3d 578, 591 (Ind. Ct.

App. 2019) (finding that "[t]he significant procedural irregularities in the CHINS case created a risk of the erroneous filing of a petition to terminate Mother's parental rights to Children, in violation of Mother's due process rights."), *aff'd in relevant part on reh'g*, 122 N.E.3d 832 (Ind. Ct. App. 2019), *trans. denied*.

[21] Father's due-process argument relies heavily on our Supreme Court's decision in *In re G.P.* There, a mother waived her right to counsel at the initial CHINS hearing, and her child was adjudicated a CHINS. At a subsequent CHINS review hearing, the mother requested that counsel be appointed. The trial court granted her request and said it would appoint her counsel, but never actually did so. The CHINS case proceeded and, eventually, the State filed a petition to terminate the mother's parental rights. Her rights were ultimately terminated. On appeal, our Supreme Court reversed, finding that a lack of counsel during the "**subsequent** CHINS proceedings that flowed directly into the termination of [the mother's] parental rights" violated her due process rights "because the very CHINS hearings where [she] was denied her right to counsel were those in which her parental participation was cut off as a precursor to the TPR action. For [the mother], the two actions are almost inextricably linked and the defectiveness of one inevitably has a destructive collateral impact on the other." *In re G.P.*, 4 N.E.3d at 1168 (emphasis added). The same is not true here. Even though Attorney Lamb was allowed to withdraw just before the CHINS hearing, the trial court appointed a new attorney for Father after that hearing. As a result, Father was represented by counsel for the next eleven months of

CHINS proceedings and could have demonstrated his parenting abilities by engaging in services or appearing for hearings but chose not to. This is the opposite of what led our Supreme Court to reverse the termination order in *In re G.P.*[1]

## II. Sufficiency

[22] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[23] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

---

[1] Father argues, and the State concedes, that Attorney Lamb's motion to withdraw did not comply with Marion County's local rule for withdrawal of counsel. *See* LR49-TR3.1-201. Regardless of this non-compliance, our due-process analysis is not affected.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[24]    Father challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. In determining whether such a reasonable probability exists, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

Here, Father fails to demonstrate that he was any closer to providing Child a safe, stable home than he was at the beginning of the CHINS case. The trial court found that DCS referred Father for numerous services, often multiple times, including father engagement (referred four times, *see* Finding 24), supervised visitation, case work, home-based therapy (referred three or four times, *see* Finding 21), a mental-health assessment, and random drug screens. However, despite being referred for services numerous times, Father chose not to participate in services and instead was convicted of Level 6 felony possession of methamphetamine during the CHINS case. Specifically, the trial court found (and Father does not challenge) that "Father has convictions in 2018 and 2019 for possession of methamphetamine." Appellant's App. Vol. II p. 23 (Finding 44). Moreover, Father's failure to engage in visitation with Child and failure to appear for most court hearings, including the termination fact-finding hearing, demonstrates his lack of commitment to reunifying with Child. *See In re A.F.*, 762 N.E.2d 1244, 1252 (Ind. Ct. App. 2002) (a parent's failure to appear for assessment and court hearing reflects ambivalence), *trans. denied*. As such, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside Father's home will not be remedied.[2]

---

[2] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied, we need not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-4-(b)(2)(B) is

Affirmed.

May, J., and Robb, J., concur.

---

written in the disjunctive and requires trial courts to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

To the extent that Father argues that the services offered by DCS did not comply with the Americans with Disabilities Act (ADA), he has waived this argument because he did not raise this issue before the trial court. *In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) ("Issues not raised at the trial court are waived on appeal."), *trans. denied*. In any event, Father has failed to show, by citation to the record, how the services he was provided were not in compliance with the ADA and did not accommodate his bipolar disorder.